47 P.3d 1209

Carole McKENZIE, Individually and as Prochein Ami for Kathryn McKenzie, a minor; and Roger McKenzie, Plaintiffs,

v.

HAWAI'I PERMANENTE MEDICAL GROUP, INC.; Kaiser Foundation Health Plan, Inc.; and Jerry I. Wilson, Defendants.

No. 23268.

Supreme Court of Hawai'i.

June 10, 2002.

See also 29 F.Supp.2d 1174.

George W. Playdon, Jr., Kelvin H. Kaneshiro, M. Lorena Garwood, Celia A. Urion, Honolulu, and Jeffrey K. Hester (of Reinwald, O'Connor & Playdon), on the briefs, for defendants Hawai i Permanente Medical Group, Inc. and Kaiser Foundation Health Plan, Inc.

Kathy K. Higham, Honolulu, (of Kessner, Duca, Umebayashi, Bain & Matsunaga), on the briefs, for defendant Jerry I. Wilson.

L. Richard Fried, Jr., John D. Thomas, Jr., Bert S. Sakuda, and Patrick F. McTernan, Honolulu, (of Cronin, Fried, Sekiya, Kekina & Fairbanks), on the briefs, for plaintiffs.

Thomas J. Wong and Ann S. Isobe, Honolulu, (of Devens, Nakano, Saito, Lee, Wong & Ching), on the briefs, for amicus curiae The Hawai'i Dental Association.

Gary N. Hagerman, Hilo, on the briefs, for amicus curiae Hawai'i Medical Association.

Paul Maki, Honolulu, on the briefs, for amicus curiae The Hawai'i Pharmacists Association.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by MOON, C.J.

Plaintiffs Carole McKenzie, individually and as Prochein Ami for Kathyrn McKenzie, a minor, and Roger McKenzie [hereinafter, collectively, the McKenzies] filed an action in the United States District Court for the District of Hawai'i (the district court) against defendants Hawai'i Permanente Medical Group, Inc., Kaiser Foundation Health Plan, Inc. [hereinafter, collectively, Kaiser], and Jerry I. Wilson for negligence arising out of an incident in which plaintiff Kathryn McKenzie, a pedestrian, was seriously injured when she was struck by an automobile driven by Wilson. The McKenzies and Wilson claim that the accident was caused by a fainting episode precipitated by the negligent prescription of medication to Wilson by Robert Washecka, M.D. (Dr. Washecka), an employee of Kaiser.[1] Kaiser is being sued under the doctrine of respondeat superior. Recognizing that there is no clear Hawai'i precedent concerning whether a physician could be sued for negligence by a third party who is not the physician's patient, the district court certified the following question to this court pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 13 (2000)[2]:

> Does a physician owe a legal duty which would create a cause of action legally cognizable in the courts of Hawai'i for personal injury of a third party who was injured in an accident caused by his or her patient's adverse reaction to a medication that the physician negligently prescribed three days prior to the accident?

We answer the certified question with a qualified "yes" as discussed herein.

## I. BACKGROUND

The following background information is derived from the portion of the district court's order entitled "Facts and Prior Proceedings[.]"

This case involves a medical malpractice and personal injury action to recover damages for injuries suffered by Kathryn McKenzie, a minor, who was injured on August 8, 1997 when she was hit by a vehicle driven by Wilson. The McKenzies and Wilson claim the accident occurred because Wilson fainted while driving due to an adverse reaction to a medication negligently prescribed by Wilson's physician, Dr. Washecka.

On August 5, 1997, Dr. Washecka, a Kaiser physician, prescribed prazosin hydrochloride,

---

1. Wilson filed a cross-claim against Kaiser.

2. HRAP Rule 13(a) states:
   When a federal district or appellate court certifies to the Hawai'i Supreme Court that there is involved in any proceeding before it a question concerning the law of Hawai'i that is determinative of the cause and that there is no clear controlling precedent in the Hawai'i judicial decisions, the Hawai'i Supreme Court may answer the certified question by written opinion.

a generic form of the drug Minipress [hereinafter, prazosin], to treat a medical condition that Wilson had. Wilson was instructed to take a two milligram (mg.) tablet of prazosin at bedtime for three days, starting on August 5, 1997. Wilson was further instructed that, if he did not experience any side effects during the first three days, he was to take a 2 mg. tablet of prazosin twice a day, once in the morning and once at bedtime beginning the fourth day, August 8, 1997. Factual disputes exist as to whether the prescribed dosages were proper. Wilson was verbally warned by Dr. Washecka (presumably on August 5), and also through the medication's warning labels, of potential side effects and precautions regarding driving while on the medication.

Wilson alleges that he took his first three bedtime-doses of prazosin on August 5, 6, and 7 without incident. Wilson also contends that he took his August 7 bedtime dose at approximately 2:00 a.m., i.e., in the early morning hours of August 8. On August 8, 1997, Wilson alleges that he took his first morning dose of prazosin at approximately 7:45 a.m. and then drove to work.

As Wilson approached Vineyard Boulevard from Pali Highway, heading towards downtown Honolulu, he began to feel nauseated and dizzy and began to hyperventilate. A few blocks later, as he proceeded southbound on Bishop Street, he allegedly fainted and hit the car in front of him. Wilson's car then veered right and entered onto the sidewalk striking Kathryn McKenzie.

Prazosin has several known side effects, including fainting. The McKenzies' expert states that Kaiser doctors were the only physicians in Honolulu who prescribed prazosin. According to the McKenzies' expert, prazosin was not the preferred drug to prescribe in 1997 for the treatment of Wilson's condition; other available medications should have been used to treat Wilson because the use of these other medications would have reduced the risk of an adverse reaction. The McKenzies also state that prazosin is three times cheaper than the other preferred medications. The McKenzies and Wilson argue that Wilson fainted because he took prazosin that morning. Thus, the McKenzies and Wilson

allege that Dr. Washecka negligently prescribed prazosin, negligently prescribed an excessive dose of prazosin, and failed to give Wilson sufficient warning of its side effects. Kaiser disputes liability and the contentions of the McKenzies' expert witness and claims that the accident was not in any way caused by the prazosin prescribed to Wilson.

This case was set to begin trial on March 7, 2000. However, on March 6, 2000, Kaiser filed a memorandum requesting certification to this court. Following a hearing that day, the district court postponed the trial pending certification of the aforementioned question.

## II. DISCUSSION

A prerequisite to any negligence action is the existence of a duty owed by the defendant to the plaintiff that requires the defendant to conform to a certain standard of conduct for the protection of the plaintiff against unreasonable risks. *Lee v. Corregedore*, 83 Hawai'i 154, 158–59, 925 P.2d 324, 328–29 (1996). This court ordinarily addresses whether a defendant owes a duty of care to a particular plaintiff as a question of law. *See Blair v. Ing*, 95 Hawai'i 247, 253, 21 P.3d 452, 458 (2001); *Lee*, 83 Hawai'i at 158, 925 P.2d at 328. The existence of a duty concerns "whether such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other-or, more simply, whether the interest of a plaintiff who has suffered invasion is entitled to legal protection at the expense of a defendant[.]" *Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 353, 944 P.2d 1279, 1296 (1997). Because our task is to ascertain whether Dr. Washecka owes a duty to the McKenzies, it necessarily requires a presumption that Dr. Washecka was negligent in his treatment of Wilson. We, therefore, assume, for the purpose of our analysis, that Dr. Washecka was negligent.

The parties to this case present several arguments. Kaiser essentially argues that: (1) it owes no duty to the McKenzies because they are not patients of Dr. Washecka; (2) Dr. Washecka does not have a "special relationship" with Wilson mandating that Dr. Washecka control Wilson's behavior for the

McKenzies' benefit; and (3) public policy concerns further compel the conclusion that physicians do not owe a duty to non-patient third parties. According to Kaiser, the social utility of medication usage far outweighs the risk of harm to unrelated non-patients. Kaiser maintains that exposing physicians to liability for harm to such persons would discourage beneficial medication prescriptions and would create "divided loyalties" between physicians and their patients, requiring physicians to choose between the interests of their patients and those of unknown non-patients. The McKenzies, on the other hand, argue that: (1) where—as here—the defendant's conduct in negligently prescribing prazosin creates the injury, pursuant to Restatement (Second) of Torts (1965) [hereinafter, Restatement (Second) ] § 302, foreseeability, rather than the existence of a "special relationship" between the physician and patient, is the major criterion determining whether a duty is owed them by Dr. Washecka; (2) even if a "special relationship" is necessary to create a duty entitling them to protection, a physician-patient relationship is such a relationship; and (3) policy considerations, including deterrence of negligent conduct, the fair allocation of the costs of harm, and fair compensation for victims, mandate that Kaiser owes a duty to them. The McKenzies further contend that Kaiser's policy concerns are exaggerated and that imposition of a duty in this case would impose no more of a duty upon physicians than they presently owe to their own patients. Wilson agrees with the McKenzies and also generally asserts that it is sound public policy to hold physicians accountable to the general public for negligent prescribing practices when it is foreseeable that a member of the public will be harmed by such practices.

In addition to the parties to this case, amicus curiae briefs submitted by the Hawai'i Pharmacists Association, the Hawai'i Dental Association, and the Hawai'i Medical Association (HMA) generally support the policy considerations cited by Kaiser. The HMA emphasizes in particular the potential effect that imposition of a duty in this case could have on the prescription practices of psychiatrists and the welfare of psychiatric patients.

### A. Applicability of the "Special Relationship" Analysis and Restatement (Second) § 302

#### 1. "Special Relationship"

■ The parties dispute whether Dr. Washecka has a "special relationship" with Wilson that entitles the McKenzies to protection. The Restatement (Second) § 315 (1965) states:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Section 315 is a special application of the general rule stated in Restatement (Second) § 314 (1965) that a person does not have a duty to act affirmatively to protect another person from harm.[3] *See* Restatement (Second) § 315 (1965) comment a ("[Section 315] is a special application of the general rule stated in § 314."); *see also Lee*, 83 Hawai'i at 159, 925 P.2d at 329 (citing Restatement (Second) § 314). Section 314 applies "only where the peril in which the actor knows the other is placed is not due to any active force which is under the actor's control. If a force is within the actor's control, his failure to control it is treated as though he were actively directing it and not as a breach of duty to take affirmative steps[.]" Restatement (Second) § 314 (1965) comment d; *see also Touchette v. Ganal*, 82 Hawai'i 293, 302, 922 P.2d 347, 356 (1996) (Noting that the considerations pertaining to "special relationships" are "based on the concept that a person should not be liable for 'nonfeasance' in failing to act as a 'good Samaritan.' [Such

---

**3.** Restatement (Second) § 314 states:
The fact that the actor realizes or should realize that action on his part is necessary for

another's aid or protection does not of itself impose upon him a duty to take such action.

considerations have] no application where the defendant, through his or her own action (misfeasance) has made the plaintiff's position worse and has created a foreseeable risk of harm from the third person. In such cases the question of duty is governed by the standards of ordinary care.") (Citing *Pamela L. v. Farmer,* 112 Cal.App.3d 206, 169 Cal.Rptr. 282, 284 (1980).) (internal emphases and citations omitted). Accordingly, the "special relationship" arguments put forth by the parties are inapplicable to this case because medical malpractice involving the negligent prescription of medication is "misfeasance" that is not analogous to the "nonfeasance" in failing to act as a "Good Samaritan" or failing to take affirmative "action" as the term is used by Restatement (Second) § 314.[4]

### 2. Applicability of Restatement § 302

Relying upon *Touchette* and Restatement (Second) § 302, the McKenzies contend that the proper framework for analyzing this case is whether Dr. Washecka's action in negligently prescribing prazosin created a risk of harm to them through the action of a third party—his patient Wilson. The McKenzies are correct, although *Touchette* and the language of Restatement (Second) § 302 do not necessarily mandate that Dr. Washecka owes a duty to them.

Restatement (Second) § 302 states:

A negligent act or omission may be one which involves an unreasonable risk of harm to another through either

(a) the continuous operation of a force started or continued by the act or omission, or

(b) the foreseeable action of the other, a third person, an animal, or a force of nature.

Ostensibly, Kaiser could be liable to the McKenzies pursuant to subsection (b) because it is foreseeable that Wilson would drive after ingesting a negligently prescribed

medication and therefore subject them to harm. When the tortfeasor instigates the act causing harm—such as by prescribing medication—Restatement (Second) § 302 generally applies. *See* Restatement (Second) § 314 comment d. Consistent with this view, we held in *Touchette* that, under Restatement (Second) § 302, the defendant might owe a duty to the plaintiffs, family members of her extramarital lover who were harmed by the assaultive behavior of the defendant's husband (the third party), where the husband's behavior was ostensibly caused by the defendant's affirmative "misfeasance" of taunting her husband and causing him to suffer extreme emotional distress leading to the assaults. *Touchette,* 82 Hawai'i at 304, 922 P.2d at 358; *cf. Lee,* 83 Hawai'i at 156–58, 162, 925 P.2d at 326–28, 332 (veterans counselor who did not provide psychiatric or psychological counseling services did not owe a duty, pursuant to Restatement (Second) § 302, for alleged "nonfeasance" in failing to warn a veteran's father of the veteran's threat to commit suicide).

However, Restatement (Second) § 302 by itself does not create or establish a legal duty; it merely *describes* a type of negligent act. Comment a to this section states in relevant part that:

[Section 302] is concerned only with the negligent character of the actor's conduct, and *not with [the actor's] duty to avoid the unreasonable risk.* In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable [person] to protect them against an unreasonable risk of harm to them arising out of the act.... *If the actor is under no duty to the other to act, his failure to do so may be negligent conduct within the rule stated in this Section, but it does not subject him to liability, because of the absence of duty.*

(Emphases added). *See also* Restatement (Second) (1965) table of contents (the struc-

---

**4.** In *Seibel v. City and County of Honolulu,* 61 Haw. 253, 261, 602 P.2d 532, 538 (1979), this court referred in dictum to the possible existence of a special relationship between a physician and patient "to warn foreseeably endangered persons of the risk of harm created by a patient's conduct[,]" referring to, *inter alia, Tarasoff v. Re-*

*gents of the University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). The present case does not involve circumstances similar to the dangerous patient in *Tarasoff* who threatened to kill a readily identifiable party. *See id.* at 341.

ture of which indicates that the conduct described in § 302 is one of several "types of negligent acts"). Accordingly, the fact that Dr. Washecka's negligent conduct falls under the rubric of Restatement § 302 does not establish per se that he owes a duty to the McKenzies; it only describes the *manner* in which he may be negligent *if* he owed a duty to the McKenzies.[5] To determine whether the negligent prescription of prazosin created an "unreasonable risk of harm" to the McKenzies—and thus whether Dr. Washecka owed a duty to them—we turn to the usual considerations that constitute an analysis of whether a duty exists.

### B. Determining Whether to Impose a Duty

Regarding the imposition of a duty of care, this court has noted generally that:

> In considering whether to impose a duty of reasonable care on a defendant, we recognize that duty is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. *Waugh v. University of Hawaii*, 63 Haw. 117, 135, 621 P.2d 957, 970 (1980); *Kelley v. Kokua Sales & Supply, Ltd.*, 56 Haw. 204, 207, 532 P.2d 673, 675 (1975). Legal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done. *Id.* (quoting *Tarasoff [v. Regents of the Univ. of California]*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d [334,] 342 [ (Cal.1976) ] ). In determining whether or not a duty is owed, we must weigh the considerations of policy which favor the appellants' recovery against those which favor limiting the appellees' liability. *Waugh*, 63 Haw. at 135, 621 P.2d at 970; *Kelley*, 56 Haw. at 207, 532 P.2d at 675. The question of whether one owes a duty to another must be decided on a case-by-case basis. *Waugh*, 63 Haw. at 135, 621 P.2d at 970. However, we are reluctant to impose a new duty

upon members of our society without any logical, sound, and compelling reasons taking into consideration the social and human relationships of our society. *Birmingham v. Fodor's Travel Publications, Inc.*, 73 Haw. 359, 370–71, 833 P.2d 70, 76 (1992) (holding that "a publisher of a work of general circulation, that neither authors nor expressly guarantees the contents of its publication, has no duty to warn the reading public of the accuracy of the contents of its publication"); *Johnston v. KFC Nat'l Management Co.*, 71 Haw. 229, 232–33, 788 P.2d 159, 161 (1990) (declining to impose a duty upon non-commercial suppliers of alcohol, *i.e.*, social hosts, to protect third parties from risk of injuries that might be caused by adults who consume the social hosts' alcohol).

*Blair*, 95 Hawai'i at 259–60, 21 P.3d at 464–65 (citing *Lee*, 83 Hawai'i at 166, 925 P.2d at 336). We now turn to these policy considerations and the cases from other jurisdictions that the parties call to our attention.

We begin by noting that, although the certified question inquires whether a duty is owed to a third party injured in an accident caused by an adverse effect of negligently prescribed medication, the facts supplied by the district court suggest that the McKenzies' negligence claim appears to rest on three general theories. First, the McKenzies claim that the decision to prescribe prazosin in the first instance constituted negligence. Second, the McKenzies claim that the manner in which Dr. Washecka prescribed the prazosin was negligent, namely, that the dosages were too high. Third, the McKenzies claim that Dr. Washecka was negligent because he did not provide Wilson with adequate warning of the danger associated with driving an automobile while taking the medication. The first two theories involve decisions such as whether to prescribe a medication at all, which particular medication to prescribe, and the particular dosage level or

---

**5.** Similarly, we did not hold in *Touchette* that the defendant owed a duty to the plaintiffs on the grounds that the defendant's affirmative conduct in taunting her husband (the third party) caused her husband to assault the plaintiffs. We merely held that the trial court erred in dismissing the plaintiffs' cause of action for failure to state a claim without considering the plaintiffs' contention that there *might* be a duty pursuant to Restatement (Second) § 302. *See Touchette*, 82 Hawai'i at 303–04, 922 P.2d 347, 357–58.

schedule to prescribe [hereinafter, prescribing decisions]; the latter theory involves failure to warn. Although the cases relied upon by the parties do not always expressly delineate this distinction, the distinction is often a key factor in their outcome. Accordingly, we consider the question of duty with respect to negligent prescribing decisions and negligent failure to warn separately. For each issue, we shall "weigh the considerations of policy which favor" recovery "against those which favor limiting" liability to determine if any logical, sound, or compelling reason exists to impose a new duty.[6]

### 1. Negligent Prescribing Decisions

The McKenzies argue that the fair allocation of the costs of harm and the need for fair compensation to victims mandates that physicians owe a duty to non-patient third parties injured as a result of negligent prescribing decisions. Wilson suggests that physicians owe a duty to the public generally. Indeed, other courts have recognized that imposition of a tort duty upon physicians for the benefit of the general public is not new. *See generally Gooden v. Tips*, 651 S.W.2d 364, 370–71 (Tex.Ct.App.1983) (discussing statutory requirement that physicians report the existence of certain sexually transmitted diseases to health authorities); *Welke v. Kuzilla*, 144 Mich.App. 245, 375 N.W.2d 403, 406 (1986) (noting generally in discussion of duty that highway safety is an important public concern). All of the foregoing policy considerations are important. In addition, the McKenzies cite to a number of cases, discussed *infra*, where other courts appear to

have permitted actions involving allegations of negligent prescribing decisions to proceed.

In support of its argument that a physician never owes a duty to non-patients, Kaiser cites to, *inter alia, Lester v. Hall*, 126 N.M. 404, 970 P.2d 590 (1998). In *Lester*, the plaintiff, a non-patient of the defendant physician, was injured by the physician's patient in an auto accident. *See id.* at 591. The plaintiff alleged that the physician negligently monitored his patient's medication and failed to warn his patient that the medication, lithium, could impair the patient's driving ability. *Id.* The patient had last seen the physician five days before the accident. *Id.* Answering a certified question from the United States District Court for the District of New Mexico, the New Mexico Supreme Court held that the doctor owed no duty to the non-patient plaintiff. *Id.* In so holding, the court considered several important policies in balancing "the likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon the defendant[,]" *id.* at 592 (citations omitted), a duty analysis similar to our own. Most significantly, the court was concerned that the extension of a duty to non-patients "would have a potentially serious chilling effect on the use of prescription medication in medical care" and. that it would intrude "upon the indispensable loyalty which physicians must maintain towards their patient regarding their medical care and treatment decisions" insofar as physicians would have to choose between prescribing beneficial medications to their patients and the risk that their prescribing decisions may result in liability to unknown third parties. *See id.* at

---

**6.** The McKenzies suggest that this question was already answered in *Kailieha v. Hayes*, 56 Haw. 306, 536 P.2d 568 (1975). In *Kailieha*, a Hawai'i resident visiting in Virginia saw a physician there and received a prescription. *Id.* at 306, 536 P.2d at 569. Shortly thereafter, the resident returned home and was involved in an automobile accident in Honolulu, injuring the plaintiff, an unrelated third party who was also a Hawai'i resident. *Id.* The plaintiff sued the Virginia physician in the circuit court on the grounds that his negligent diagnosis and treatment was a proximate cause of the accident. *Id.* at 307, 536 P.2d at 569. The nonresident defendant physician filed a special appearance in circuit court to contest personal jurisdiction. *Id.* at 307, 536

P.2d at 569. This court reasoned that, for purposes of exercising jurisdiction pursuant to Hawai'i's "long arm" statute, the defendant's conduct fell within the definition of the term "tort" as that term was used in the statute. *See id.* However, the court concluded that the assertion of jurisdiction over the defendant would violate his due process rights under the federal constitution. *See id.* at 312, 536 P.2d at 572. This court did not determine whether the complaint stated a legally cognizable claim for relief—*i.e.*, whether the physician owed a duty to the non-patient plaintiff—nor was it required to do so in order to reach the jurisdiction question. Accordingly, *Kailieha* is inapposite to this case.

593; *accord Webb v. Jarvis,* 575 N.E.2d 992, 997 (Ind.1991).

Prescribing decisions must take into account complicated issues concerning the potential benefits and risks to individual patients. Moreover, although we do not believe that doctors would altogether stop prescribing beneficial medications to their patients because of the risk of liability to third parties, an expansion of such liability would certainly discourage some prescriptions—particularly, as amicus curiae HMA points out, the prescription of psychiatric medications that necessarily have behavioral effects. The social utility of these medications is enormous, and we do not want to discourage their use. The risk of tort liability to individual patients should be enough to discourage negligent prescribing decisions. As discussed *infra,* the risk of injury to non-patient third parties can be readily addressed through the more narrow question of whether there is a duty to warn patients against driving while under the influence of the medication.

■ Moreover, controversially but realistically, physicians and patients must consider factors such as cost, cost-effectiveness, and availability of insurance coverage in prescribing decisions. Insurers likewise must consider treatment effectiveness and cost in determining which treatments to pay for and which medications to include on hospital and clinic formularies. A decision to cover one type of treatment may preclude funding for another. In this case, for example, the McKenzies seek to hold Kaiser accountable for what they suggest is Kaiser's decision to require its physicians to prescribe prazosin instead of other preferable but more expensive medications. Health care policy decisions require a complicated array of considerations by a variety of private and public decision makers, which include physicians, other professionals, regulators, employers, patients, and other health care consumer representatives who have a stake in such decisions. We believe that these policy decisions are better left to the aforementioned stakeholders than to judges and juries, at least with respect to non-patient third parties injured in automobile accidents. Similarly, individual treatment decisions are best left to patients and their physicians. "[D]octors should not be asked to weigh notions of liability in their already complex universe of patient care." *Lester,* 970 P.2d at 593 (internal quotation marks omitted). Accordingly, considering the social utility of medications, the multitude of issues that already must be considered in prescribing decisions, the reality that existing tort law which is applicable to the individual patient should be sufficient to discourage negligent prescribing decisions, and the fact that imposing a duty to warn may readily reduce the risk to third parties, we discern no logical, sound, or compelling reasons, under the present circumstances, to introduce into the "already complex universe of patient care" the additional risk of tort liability to non-patient third parties injured in automobile accidents.

To the extent that certain cases relied upon by the McKenzies involve negligent prescribing decisions, we believe they are distinguishable from the instant case. The cases cited by the McKenzies involve the prescription of controlled substances, which are well-known—even to the lay observer— to be commonly abused and, when abused, to cause impairment in many respects, including the impairment of driving ability. Further, the cases involve circumstances where it is obvious from the context that the "third party" presented an unreasonable hazard to others.

For example, in *Zavalas v. Olivares,* 124 Or.App. 166, 861 P.2d 1026 (1993), the plaintiffs were killed or injured in an automobile accident caused by a patient who overdosed on heroin and Xanax (alprazolam), a controlled substance similar to Valium (diazepam).[7] *Id.* at 1026–27. The physician was purportedly "easy" about prescribing Xanax and prescribed one hundred tablets to the patient the first time he met her without obtaining a complete history because he was pressed for time. *Id.* at 1027. The physician also did not examine the patient's arms and,

---

7. *See, e.g.,* Dan J. Tennenhouse, Attorneys Medical Deskbook 3D § 24:6 (1993) (describing drug classifications) and Hawai'i Revised Statutes § 329–20 (Supp.2001) (identifying Class IV controlled substances).

thus, did not notice the needle marks thereon. *Id.* Three days later, the physician refilled the prescription, and several days thereafter, the patient caused the accident. *Id.* At the time of the accident the patient was found to have Xanax, heroin, cocaine, and marijuana in her system. *Id.* Reversing a grant of summary judgment in favor of the physician, the Oregon Court of Appeals held that it was unwilling to categorically state, as a matter of law, that the physician did not owe a duty to the plaintiffs under any set of facts. *Id.* at 1029.

Similarly, in *Welke,* the Michigan Court of Appeals reversed a grant of summary judgment in favor of the defendant doctor where the doctor had allegedly improperly prescribed controlled substances to a patient who killed the plaintiff in an auto accident. *Welke,* 375 N.W.2d at 404; *see also Welke v. Kuzilla,* 140 Mich.App. 658, 365 N.W.2d 205, 208 (1985) (Bronson, J., dissenting).[8] The doctor had also injected his patient, a friend who was driving the doctor's car at the time of the accident, with an "unknown substance" the night before. *Welke,* 375 N.W.2d at 404.

Finally, in *Watkins v. United States,* 589 F.2d 214 (5th Cir.1979), the United States Court of Appeals for the Fifth Circuit, applying Alabama law and considering a challenge to the sufficiency of the evidence, affirmed a verdict in favor of a plaintiff who was injured in an automobile accident proximately caused by the defendant physician's prescription to the driver of a large amount of Valium several days earlier. *Id.* at 217. In so doing, the Fifth Circuit emphasized the trial court's finding that the prescribing physician had failed to inquire into the patient's recent psychiatric history, which the appeals court implied would have "plainly preclude[d] the prescription." *See id.*

It is widely known, even among the lay public, that individuals who abuse controlled substances can be impaired by those substances. It is also widely known that individuals who abuse controlled substances often seek to obtain access to these substances by a variety of means, including misrepresenting their need for the drugs to physicians and other health care providers. The facts in the cases relied upon by the McKenzies implicate the foregoing concerns where it was foreseeable that the patient "could not be expected to take the medicine prescribed ... in the manner intended." *See Gooden,* 651 S.W.2d at 365. Finally, the serious adverse effects of drug abuse and the fact that abusers of controlled substances can be dangerous to themselves and others cannot be seriously disputed; for this reason, the prescribing of controlled substances is already highly regulated to a degree not present with other medical interventions. Thus, the prescribing of controlled substances represents a unique set of circumstances and implicates policy considerations not applicable to the case at bar.[9] Accordingly, without deciding whether

**8.** The latter case, in which the plaintiffs' allegations concerning controlled substances are discussed, is an earlier appellate decision involving the same case.

**9.** In addition, other cases relied upon by the McKenzies are inapplicable to the instant case. In *Freese v. Lemmon,* 210 N.W.2d 576 (Iowa 1973), the Iowa Supreme Court held that a defendant physician might owe a duty to unknown third parties injured in a automobile accident caused by a seizure patient where it was alleged that the physician had failed to properly diagnose and treat an earlier seizure suffered by the patient and negligently failed to advise his patient of the risks associated with driving an automobile. *Id.* at 578–80. The court's primary reasoning, however, appeared to rest on the fact that the physician reportedly failed to warn his patient of the risk of driving. *See id.* at 579–80. Therefore, *Freese* is more of a "failure to warn" case. *See also Duvall v. Goldin,* 139 Mich.App. 342, 362 N.W.2d 275, 279 (1985) (seizure pa-

tient); *Myers v. Quesenberry,* 144 Cal.App.3d 888, 193 Cal.Rptr. 733 (1983) (emotionally upset patient with unstable diabetes; discussed *infra* ).

Other cases are similarly not analogous to the instant case. *Schuster v. Altenberg,* 144 Wis.2d 223, 424 N.W.2d 159 (1988), primarily involved the failure to control a dangerous psychiatric patient. *Wharton Transport Corp. v. Bridges,* 606 S.W.2d 521 (Tenn.1980), involved a suit for indemnity or, alternatively, contribution, by a plaintiff trucking company against its own agent, an industrial medicine physician, for failure to discover a truck driver's medical problems—including poor vision—that ostensibly led to the truck company paying claims to settle a lawsuit brought by persons injured by the driver. *See id.* at 522. Because the express purpose of the physician's examination was to certify the driver as safe to drive, *see id.* at 526–28, *Wharton* is not analogous to this case. Finally, *Harden v. Allstate Ins. Co.,* 883 F.Supp. 963, 971–72 (D.Del. 1995), which concluded that the defendant physi-

we would carve out an exception in a case involving controlled substances, we hold that a physician does not owe a duty to non-patient third parties injured in an automobile accident caused by the patient's adverse reaction to a medication negligently prescribed by the physician three days earlier where the negligence involves prescribing decisions as that term is used in this opinion.

## 2. Negligent Failure to Warn of Driving Risks

If Dr. Washecka owes any duty to the McKenzies in this case, such a duty arises from negligently failing to warn Wilson about the risk of operating a vehicle while under the influence of the medication. The strongest support for this proposition in the case law can be found in *Kaiser v. Suburban Transportation System*, 65 Wash.2d 461, 398 P.2d 14 (1965). In *Kaiser*, the defendant physician prescribed a sedating antihistamine to his patient, whom the physician knew to be a bus driver. *Id.* at 15–16. After taking the first dose of the medication the following morning, the driver went to work and was involved in an accident after falling asleep while driving the bus. *Id.* at 19 (Hale, J., dissenting). The driver had apparently felt groggy before the accident but continued to drive nonetheless. *Id.* A passenger on the bus was injured in the accident and sued the doctor and the bus company. *Id.* at 15 (majority opinion). The trial court dismissed the case against the doctor at the conclusion of the evidence on the grounds that the evidence did not show any standard of care to which the doctor was bound and that, even if the doctor was negligent in not warning the driver that the medication may cause sedation, the driver's negligence in failing to stop when he began to feel drowsy was an intervening cause. *Id.* The trial court, therefore, directed a verdict against the driver. *Id.* The Washington Supreme Court reversed. *Id.* at 19.

In so doing, the supreme court noted that the evidence suggested that the doctor may not have informed his bus driver-patient of

"the dangerous side effects of drowsiness or lassitude" from the drug and that expert evidence suggested that it was negligent not to do so. *Id.* at 16. The court also held that the plaintiff was entitled to judgment as a matter of law on the issue of liability against either the bus driver, the doctor, or both, depending upon whether the doctor had informed the driver of the risk of drowsiness and whether the driver was contributorily negligent. *Id.* at 18–19. In remanding the case, the court held that:

> The jury should be directed that (a) in the event it finds no warning was given the bus driver as to the side effects of the drug, it shall bring in a verdict against . . . the doctor; (b) in the event the jury finds the bus driver failed to exercise the highest degree of care, even though he was given no warning as to the side effects of the drug, the jury shall also bring in a verdict against the bus company and the driver; and (c) in the event the jury finds that a warning of the side effects of the drug was given to the bus driver, then the verdict shall be against the bus company and the driver only.

*Id.* at 19. Thus, the basis of the doctor's duty to the non-patient bus passenger stemmed solely from the need to warn his patient, a bus driver, of the potential side effect of drowsiness.

Indeed, in many of the cases discussed in the previous section in which it was determined that a physician may owe a duty to non-patients, it appears that the physician's failure to warn his or her patient of the potential effects of the patient's medication or condition on driving ability was the predominant factor in the court's decision. In *Gooden*, for example, the Texas Court of Appeals reversed the trial court's grant of judgment on the pleadings in favor of the physician defendant where the physician allegedly prescribed Quaalude to a patient who subsequently injured the plaintiff in an auto accident. *See Gooden*, 651 S.W.2d at 365. The patient had been a patient of the doctor for twenty years and the physician was

cian owed a duty to a non-patient on the basis of the physician's "special relationship" with a seizure patient, is based upon an interpretation of

Restatement (Second) § 315 that we do not share. *See supra* Section II.A.1.

**306**

aware of the patient's drug abuse problems. *See id.* The court held that the physician "may have had a duty to *warn* his patient not to drive." *Id.* at 370 (emphasis in original); *see also Freese, Myers,* and *Duvall, supra* note 9. Moreover, although the courts in *Welke* and *Schuster* did not expressly discuss the failure to warn issue as a predominant factor in their reasoning, failure to warn may have played some role in the decision not to preclude all chance of liability before trial. *See Welke,* 365 N.W.2d at 208 (decided at summary judgment stage); *Schuster,* 144 Wis.2d at 229–30, 424 N.W.2d at 161–62 (decided on pleadings). In these cases, failure to warn was included among several other claims which both courts allowed to proceed.

Kaiser relies primarily upon *Lester, Webb, Werner v. Varner, Stafford & Seaman, P.A.,* 659 So.2d 1308 (Fla.App.1995), *Conboy v. Mogeloff,* 172 A.D.2d 912, 567 N.Y.S.2d 960 (App.Div.1991), and *Kirk v. Michael Reese Hospital & Medical Center,* 117 Ill.2d 507, 111 Ill.Dec. 944, 513 N.E.2d 387 (1987), to support its argument that there should never be a duty to non-patient third parties. However, these cases offer weak support for the proposition that there is never a duty to warn of the risks of operating a vehicle while taking medication. Although the rationale relied upon in *Lester* and *Webb* (that the beneficial use of medications will be chilled) and the other considerations discussed earlier may be compelling justification for refusing to extend a duty to non-patient third parties for negligent prescribing decisions, these considerations are less persuasive when applied to the question whether physicians owe a duty to third parties to warn their patients of the potential effect on driving ability.[10] Whether there is a duty in such circumstances must again be determined by balancing the considerations in favor of—and against—imposing such a duty.

It appears obvious that warning a patient not to drive because his or her driving ability may be impaired by a medication could potentially prevent significant harm to third parties. There is "little [social] utility in failing to warn patients about the effects of a drug or condition that are known to the physician but are likely to be unknown to the patient." *Praesel v. Johnson,* 967 S.W.2d 391, 398 (Tex.1998). Furthermore, a physician already owes a duty to his or her patient under existing tort law to warn the patient of such a potential adverse effect. Thus, imposition of a duty for the benefit of third parties is not likely to require significant changes in prescribing behavior.

One consideration opposing imposition of a duty to warn derives from the fact that warnings may not be effective in all circumstances. Sometimes, the incremental benefit to be obtained from requiring warnings may not be significant.[11] For example, the court in *Lester* expressed doubt about the effectiveness of warnings:

> In determining whether to erect a legal duty to warn, we must also consider the efficacy of that warning in preventing injury to third parties. We cannot simply assume that a person who is advised not to drive will actually respond and refrain from driving. The consequences of placing a legal duty on physicians to warn may subject them to substantial liability even though their warnings may not be effective to eliminate the risk in many cases. Unfortunately, many patients do not heed the admonitions of their physicians even though the consequences may be life-threatening to the patient or others.

*Id.* at 597 (quoting *Praesel,* 967 S.W.2d at 398). In *Lester,* however, the plaintiff did not claim that the medication had been prescribed for the first time by the defendant

---

**10.** Indeed, in *Webb,* which involved an allegation that the defendant physician negligently prescribed anabolic steroids, causing his patient to become violent and injure the plaintiff, the court did not separately address the issue of negligent failure to warn of the side effects of the prescription. *See Webb,* 575 N.E.2d at 995–97.

**11.** In some circumstances, an incremental benefit may be offset by the increased burden that it

would impose. For example, the "divided loyalties" argument put forth by Kaiser is also not insignificant in that many physicians and their patients-who should ordinarily have a confidential relationship in which the physician is loyal to the patient's interests-may be placed in the position of having adverse legal interests as third parties seek to sue both the patient and the physician.

physician five days before the automobile accident; rather, the plaintiff claimed that the physician had "last treated" the patient five days before the accident. *Lester*, 970 P.2d at 591. A warning is less necessary where a patient has previously taken the prescribed medication and is presumably aware of the medication's effect upon himself or herself. From the perspective of the physician, the foreseeability of injury to non-patients due to automobile accidents is considerably less under such circumstances.

Moreover, it cannot be assumed that warnings will necessarily or usually be ineffective. For example, in *Myers*, the California appeals court held that a complaint stated a cause of action against the defendant doctors for negligently failing to warn their patient against driving in an uncontrolled diabetic condition complicated by the fact that the patient was emotionally distraught after learning that she was carrying a dead fetus. *Myers*, 193 Cal.Rptr. at 733–34. The plaintiff was injured in an accident caused by the patient shortly after she left the clinic to drive to the hospital at the doctors' behest. *Id.* One of the reasons offered by the court for imposing a duty was that the doctors could easily have warned their patient not to drive in "her irrational and uncontrolled diabetic condition." *Id.* at 735. The court noted that such a warning would likely have been effective: "[h]aving otherwise complied with her doctors' professional recommendations, [the patient] presumably would have continued to follow their advice had [the doctors] warned her not to drive." *Id.*[12]

In many circumstances, however, the dangers associated with driving and a particular medication may already be commonly known or already known to the individual patient. In a related context, the court in *Praesel*, concluding that physicians do not owe a duty to non-patients to warn seizure patients against driving, reasoned:

> Balancing both the need for and the effectiveness of a warning to a patient who

already knows that he or she suffers from seizures against the burden of liability to third parties, we conclude that the benefit of warning an epileptic not to drive is incremental but that the consequences of imposing a duty are great. The responsibility for safe operation of a vehicle should remain primarily with the driver who is capable of ascertaining whether it is lawful to continue to drive once a disorder such as epilepsy has been diagnosed and seizures have occurred. Accordingly, we decline to impose on physicians a duty to third parties to warn an epileptic patient not to drive.

*Praesel*, 967 S.W.2d at 398. Thus, the scope of the physician's duty may be limited in situations where the danger is obvious, a warning would be futile, or the patient is already aware of the risk through other means.

■ To summarize, we balance the considerations in favor of imposing a duty to warn for the benefit of third parties against the considerations militating against imposition of a duty. The primary considerations favoring a duty are that: (1) it is evident that a patient who is unaware of the risk of driving while under the influence of a particular prescription medication will probably do so; (2) warning against such activity could prevent substantial harm; (3) imposing a duty would create little additional burden upon physicians because physicians already owe their own patients the same duty; and (4) the majority of jurisdictions appear to recognize a duty under some circumstances. The primary consideration militating against the imposition of a duty is that it may not be worth the marginal benefit, in some circumstances, where the effectiveness of the warning is minimal or where the reasonable patient should be aware of the risk. Such circumstances may include, *e.g.*, situations where patients have previously taken a particular medication and where patients are prescribed medications commonly known to af-

---

**12.** The court in *Myers* characterized the doctors' actions as "nonfeasance" and concluded that the doctors had a "special relationship" with their patient entitling the third party plaintiff to protection. *See Myers*, 193 Cal.Rptr. at 734–35. Inasmuch as the instant case involves the affir-

mative act of prescribing medication whereas *Myers* does not, the "special relationship" aspect of *Myers* is inapposite to the instant case. Nevertheless, the observations of the court in *Myers* concerning the efficacy of warnings are applicable here.

fect driving ability. "[T]he relative knowledge of the risk as between a patient and a physician is [a] factor to consider in deciding the threshold question of whether a physician owes a duty to third parties to warn a patient." *Praesel,* 967 S.W.2d at 398.[13] Balancing these considerations, we believe that a logical reason exists to impose upon physicians, for the benefit of third parties, a duty to advise their patients that a medication may affect the patient's driving ability when such a duty would otherwise be owed to the patient.

As presented, the facts in this case do not suggest that the adverse effects of prazosin are commonly known by the lay public; nor do the facts suggest that Wilson was likely to know the adverse effects without a warning. Dr. Washecka was in a far better position to have such knowledge. Wilson had started taking the medication only three days earlier and, from Dr. Washecka's instructions as they are presented to us, it appears that the medication was still being adjusted to its effective dosage. The facts presented to us thus do not indicate that Wilson would be expected to have sufficient past familiarity with its effects to preclude imposition of a duty. Under these circumstances, if Dr. Washecka owed Wilson a duty to inform him about the effects that prazosin may have on his driving ability (*i.e.,* if it would have been

negligent not to inform his own patient), then Dr. Washecka owes the McKenzies a duty to inform Wilson about the possibility that prazosin would adversely affect Wilson's driving ability.

We emphasize that our answer to the certified question is not intended, without more, to resolve the questions whether Dr. Washecka in fact owed Wilson a duty to warn him regarding the effects that prazosin may have on his driving ability, whether any warnings that Wilson received were adequate, or whether Dr. Washecka's conduct was the legal cause of any injury. These must be determined in the course of the subsequent proceedings.

## III. *CONCLUSION*

■ Based on the foregoing, we answer the certified question as follows. A physician does not owe a duty to non-patient third parties injured in an automobile accident caused by the patient's adverse reaction to a medication that is not a controlled substance and negligently prescribed by the physician three days earlier where the alleged negligence involves such "prescribing decisions" as whether to prescribe the medication in the first instance, which medication to prescribe, and the dosage prescribed. A physician

---

**13.** In this regard, we disagree with the categorical reasoning of the New York Appellate Division in *Conboy.* In that case, the plaintiffs, who were children injured in an auto accident caused by the doctor's patient, alleged that the patient had inquired of the physician whether she could drive while taking the medication, and the physician advised her that she in fact could drive without telling her that the medication had a sedative effect, which presumably contributed to the accident. *Conboy,* 567 N.Y.S.2d at 961. Reversing the trial court's denial of summary judgment on behalf of the doctor, the appellate division held that the physician did not owe a duty to the plaintiffs because the physician did not have sufficient ability and authority to control his patient. *Id.* at 961–62. The court reasoned:

> [The patient] consulted with [the defendant physician] for headaches. The services rendered by defendant were examination, diagnosis, prescription and advice. [The patient] was free to accept or reject defendant's diagnosis and advice and she was at liberty to seek a second opinion. In short, she had the right to decide what treatment and advice she would accept or reject.

*Id.* (citation omitted). Although it is true that the doctor could not have "controlled" his patient, the patient could not have acted upon the doctor's advice in an informed manner if the advice was inaccurate or incomplete.

We also decline to consider *Kirk* and *Werner* as persuasive authority for the proposition that there is never a duty to warn of the effects of driving. In *Kirk,* the patient involved in an automobile accident in which the plaintiff was injured had been discharged from a psychiatric facility on the same day of the accident and claimed that the defendant physicians were negligent in not warning the patient that the antipsychotic medications he was taking could "diminish" his "mental abilities[.]" *Id.* at 514–15, 111 Ill.Dec. 944, 513 N.E.2d 387. The Illinois Supreme Court declined to impose a duty on the broader grounds that no duty exists absent a direct or special relationship and refused to separately address the "failure to warn" argument. *See id.* at 532, 111 Ill.Dec. 944, 513 N.E.2d 387. Similarly, the court in *Werner* did not independently consider the "failure to warn" argument proffered by the plaintiff. *See Werner,* 659 So.2d at 1309–11.

owes a duty to non-patient third parties injured in an automobile accident caused by an adverse reaction to the medication prescribed three days earlier where the physician has negligently failed to warn the patient that the medication may impair driving ability and where the circumstances are such that the reasonable patient could not have been expected to be aware of the risk without the physician's warning. Factors to consider in determining whether the reasonable patient could have been expected to be aware of the risk include: (1) the relative knowledge of the risk as between lay persons and physicians; (2) whether the patient has previously used the medication and/or experienced the adverse effect; and (3) whether a warning would otherwise have been futile.