892 So.2d 887 (2004)
Lola Ann TAYLOR and Billy J. Taylor
v.
Dr. Kenny E. SMITH.
1011673.
Supreme Court of Alabama.
March 12, 2004.
Rehearing Denied May 21, 2004.
*889 Gary V. Conchin and Joe A. King, Jr., of Morris, Conchin, Banks & Cooper, Huntsville, for appellants.
Michael A. Florie, Joseph S. Miller, and J. Will Axon, Jr., of Starnes & Atchison, LLP, Birmingham, for appellee.
WOODALL, Justice.[1]
Lola Ann Taylor and her husband, Billy J. Taylor, appeal from a summary judgment in favor of Dr. Kenny E. Smith in the Taylors' action against him for personal injuries arising out of an automobile accident involving Lola and Glenda Ennis, one of Dr. Smith's patients. We reverse and remand.
The dispositive facts are undisputed. On April 4, 2000, Ennis visited The Gadsden Treatment Center, Inc. ("the Center"), which operated under the directorship of Dr. Smith, to begin treatment of an opiate addiction. Her treatment was provided on an outpatient basis, and included the administration of methadone.[2]
In connection with commencement of her treatment, Ennis signed a document styled "Contract for Methadone Treatment Using Methadone and Supportive Counseling" ("the contract"). The contract provided:
"I, Glenda Ennis, have agreed to participate in The Gadsden Treatment Center, Inc., methadone program and I understand that the treatment will consist of supportive counseling and methadone medication, if indicated. I further understand that the [Center's] objective will be to work towards achieving the following goals within 24 months:
"1. Administering methadone in appropriate doses in order to achieve a `blockade' effect (which is tolerance to the euphoric and depressant action of narcotics) and to eliminate the physical cravings for morphine and heroin or other morphine-like drugs.

"2. To provide supportive counseling to help me to:
"a. Improve my employability.
"b. Improve my legal status. "c. Improve my physical health.
"d. Improve my social status and self image.
"e. Achieve a drug free lifestyle within 24 months.
"I further understand that in order for me to continue as an active member of this treatment program and to be able to receive both my medication and counseling, I must follow the rules and regulations prescribed by this treatment facility. I understand that if I choose to violate these rules, I may be discharged from this program permanently and forever. I have been informed that the [Center] allows methadone maintenance treatment for 24 months continuously. If I have not made progress toward achieving the [Center's] objective toward achieving a drug free status (off all drugs including methadone) within this time period, I may receive a medically safe detox (MSD) at the end of 24 months and remain off methadone for 30 days before being considered for readmission to methadone treatment. If I have made progress towards achieving the [Center's] objective, methadone maintenance can be extended. I am aware that I have the option of continuing in counseling if I so desire while *890 awaiting readmission for methadone treatment."
(Emphasis added.) Ennis also completed a form styled "Substance Abuse History," chronicling her drug dependence. According to this history, Ennis was a "daily" user of marijuana and of certain benzodiazepines, namely, the prescription drugs Xanax and Valium. Based on information Ennis provided in her initial contacts with the Center, it was assumed at the Center that she was not being treated elsewhere by other physicians.
From April 4, 2000, to October 4, 2000, the Center performed 14 urinalyses to monitor the substances Ennis was using. Thirteen of those urinalyses revealed the presence of either marijuana, benzodiazepines, or both, in addition to methadone. Moreover, clinical notes kept by the Center, dated June 21, 2000, and July 25, 2000, reflect that Ennis was not attending group counseling sessions and "report[ed] having no desire to stop using."
Ennis visited the Center virtually every day from April 4, 2000, until September 8, 2000, and she received a dose of methadone at each visit. After receiving her daily dose of methadone at the Center, Ennis would drive herself home, an approximately 90-minute trip. On September 8, 2000, Ennis received 85 milligrams of methadone at approximately 6:00 a.m. and drove away from the Center. At 7:23 a.m., Ennis's automobile crossed into the lane of oncoming traffic and collided with an automobile being driven by Lola Taylor.
Subsequently, the Taylors sued Dr. Smith and others. Regarding Dr. Smith, the complaint alleged, in pertinent part:
"28. Prior to September 8, 2000, [Dr. Smith was] aware that Ennis had consistently tested positive for drugs other than the opiate replacement drugs that [he] provided to her.
"29. On September 8, 2000, at approximately [6:00] a.m., Ennis was a patient of [Dr. Smith's]. As part of her treatment, she received a dosage of liquid methadone.
"30. On September 8, 2000, at approximately 6:00 a.m., [Dr. Smith] allowed Ennis to leave The Center's premises while under the influence of methadone. At the time, [Dr. Smith] allowed Ennis to leave the premises, [he was] aware that she resided over ninety minutes away in Grant, Alabama.
"31. On September 8, 2000, at approximately 7:23 a.m. on County Road 5 in Grant, Alabama, Ennis, under the influence of methadone, lost control of her automobile and collided with the automobile occupied by Plaintiff Lola Ann Taylor.
"32. Defendant Dr. Smith negligently cared for, monitored and/or supervised the treatment provided Ennis as follows:
"....
"c. Dr. Smith failed to properly monitor and/or supervise Ennis while she was under the influence of methadone;
"d. Dr. Smith failed to adequately determine the proper dosage of methadone that should be administered to Ennis;
"e. Dr. Smith failed to implement a proper procedure for monitoring patients after receiving methadone treatments that would have prevented Ennis from leaving The Center and subsequently causing an automobile accident.
"f. Dr. Smith failed to intervene and prevent Ennis from leaving The Center while she was under the influence of methadone.
"33. Dr. Smith owed a duty to Plaintiff Lola Ann Taylor, who was driving on a public roadway, not to discharge Ennis, who was impaired and could not operate *891 a motor vehicle in a responsible and safe manner.
"34. As a direct and proximate result or consequence of Dr. Smith's negligence in regards to the care, monitoring, and/or supervising, Ennis, under the influence of methadone, lost control of her automobile and collided with the automobile which contained the plaintiff Lola Ann Taylor."
The Taylors sought damages for Lola's personal injuries and Billy's loss of consortium. Dr. Smith moved for a summary judgment on the sole ground that "no duty existed between [him] and [Lola Taylor]."
In opposition to Dr. Smith's summary-judgment motion, the Taylors filed the affidavit of Dr. Nathan R. Strahl, "Medical Director at Raleigh Methadone Clinic." He stated, in pertinent part:
"Methadone is a synthetic narcotic analgesic, which acts on the central nervous system and can alter the patient's perception. Methadone may very well impair the mental and/or physical abilities required for the performance of potentially hazardous tasks, such as driving a car or operating machinery....
"Combining methadone with benzodiazepines and marijuana can cause serious and potentially dangerous side effects.... These side effects include, but are not limited to, poor concentration, drowsiness and sedation. The combination of methadone with benzodiazepines and marijuana can greatly impair the mental and/or physical abilities required for the safe performance of potentially hazardous tasks, such as driving a car.... A reasonably foreseeable consequence of an individual operating a motor vehicle while combining methadone with benzodiazepines and marijuana is that a vehicle accident may occur and other persons may be injured. A medical director of a methadone clinic should have knowledge of this.
"I have reviewed the records of [Ennis] from the [Center].... Ms. Ennis indicated in her drug history on 4/4/00 that she was using Lorcet, Dilaudid, Valium, Xanax, and marijuana on a daily basis. These drugs can cause adverse reactions and enhancing side effects when combined with methadone. From April 4, 2000, until September 8, 2000, Ms. Ennis's urinalysis tested positive for drugs other than methadone on a consistent basis. Of twelve (12) urinalyses performed, Ms. Ennis tested positive for drugs other than methadone on eleven (11) occasions. Of the eleven (11) `dirty' [urine analyses], ten indicated Benzodiazepines. Of the eleven (11) `dirty' [urine analyses], seven (7) indicated THC levels (which correspond to marijuana).
"....
"The foregoing facts concerning Ms. Ennis's treatment should have drawn concern from the Medical Director of the Gadsden Treatment Center that a dangerous situation was evident and continuing regarding Ms. Ennis's methadone treatment. It is apparent that Ms. Ennis was combining prescribed methadone with other illicit drugs, which could have serious adverse reactions and side effects."
The trial court granted Dr. Smith's summary-judgment motion on the "ground that a doctor does not owe a legal duty to a third party non-patient," and certified the judgment as final, pursuant to Ala. R. Civ. P. 54(b). The Taylors appealed, contending that the trial court erred in concluding that Dr. Smith owed Lola no duty.
In Alabama, the existence of a duty is a strictly legal question to be determined by the court. Wal-Mart Stores, Inc. v. Smitherman, 872 So.2d 833 (Ala.2003); Ex parte Farmers Exch. Bank, 783 So.2d 24, 27 (Ala.2000). See also State *892 Farm Fire & Cas. Co. v. Owen, 729 So.2d 834 (Ala.1998). The existence of a duty is determined by a number of factors, including "(1) the nature of the defendant's activity; (2) the relationship between the parties; and (3) the type of injury or harm threatened." Morgan v. South Cent. Bell Tel. Co., 466 So.2d 107, 114 (Ala.1985). "`"The key factor is whether the injury was foreseeable by the defendant."'" Key v. Compass Bank, Inc., 826 So.2d 159, 170 (Ala.Civ.App.2001) (quoting Patrick v. Union State Bank, 681 So.2d 1364, 1368 (Ala.1996)) (emphasis added).
Significantly, Dr. Smith does not contend that the possibility that Ennis would be involved in an automobile accident after leaving the Center was unforeseeable. Moreover, Dr. Strahl stated:
"Combining methadone with benzodiazepines and marijuana can cause serious and potentially dangerous side effects.... These side effects include, but are not limited to, poor concentration, drowsiness and sedation. The combination of methadone with benzodiazepines and marijuana can greatly impair the mental and/or physical abilities required for the safe performance of potentially hazardous tasks, such as driving a car.... A reasonably foreseeable consequence of an individual operating a motor vehicle while combining methadone with benzodiazepines and marijuana is that a vehicle accident may occur and other persons may be injured. A medical director of a methadone clinic should have knowledge of this."
(Emphasis added.) Considering the distance and frequency of Ennis's travel in this case, as well as Ennis's persistent substance abuse, a vehicle accident was reasonably foreseeable. Thus, the legal question presented is whether the director of a methadone-treatment center owes a duty of due care to a nonpatient motorist who is injured in an automobile accident with the director's patient, when it is reasonably foreseeable that such an accident may result from the director's failure to exercise due care in administering methadone to the patient.
Dr. Smith contends that the Alabama Medical Liability Act of 1975, Ala.Code 1975, §§ 6-5-480 to -488, and the Alabama Medical Liability Act of 1987, Ala.Code 1975, §§ 6-5-540 to -552 (both acts are hereinafter collectively referred to as "the Act"), preclude any duty to a nonpatient. More specifically, he argues: "In order to establish any negligence on the part of Dr. Smith ..., the [Taylors] must necessarily travel under the [Act]. [Their] action then fails because there can be no liability under the [Act] unless there is a physician-patient relationship between the plaintiff and the defendant healthcare provider." Dr. Smith's brief, at 19 (emphasis in original). By logical extension, the conclusion of this syllogism would be that a health-care provider is absolutely immune from a legal action, except one brought by a patient.
The only authority Dr. Smith cites for this proposition is Thomasson v. Diethelm, 457 So.2d 397, 399 (Ala.1984), which, he insists, "held that," under the Act, physicians do not owe nonpatients "a legal duty." Dr. Smith's brief, at 19. Dr. Smith, however, misreads Thomasson. Thomasson held only that a nonpatient could not take advantage of the Act's two-year statute of limitations, Ala.Code 1975, § 6-5-482, and, therefore, was held to the one-year statute of limitations then provided in Ala.Code 1975, § 6-2-39. 457 So.2d at 399. It did not hold that a nonpatient could not sue a physician or that a physician owes no duty to a nonpatient.
Moreover, it does not follow that, because a nonpatient may not sue under the Act, such a suit is barred by the Act, *893 as Dr. Smith argues. On the contrary, the Act applies "only to medical-malpractice actions," Mock v. Allen, 783 So.2d 828, 832 (Ala.2000), "in the context of patient-doctor and patient-hospital relationships." Thomasson, 457 So.2d at 399. By definition, a "medical-malpractice action" is one for redress of a "medical injury." See § 6-5-540 (purpose of the Act is to regulate actions for "alleged medical injury") (emphasis added); see also Ala.Code 1975, § 6-5-549.1 (same). Because the Taylors are seeking recovery for damages and injuries arising out of an automobile accident, not "medical injuries," this is not a medical-malpractice action. Consequently, it is neither subject to  nor barred by  the Act.
Indeed, the Taylors do not purport to "travel under the Act." They argue, instead, that a duty in a case such as this one arises under ordinary principles of common law. Dr. Smith contends that there is no common-law duty, absent "special relationships or circumstances." Dr. Smith's brief, at 21. For that proposition, he cites Young v. Huntsville Hospital, 595 So.2d 1386 (Ala.1992), and Moye v. A.G. Gaston Motels, Inc., 499 So.2d 1368 (Ala.1986). Those cases, however, merely discuss the liability of a premises owner for the criminal acts of third persons and are not instructive in this case.
Applicable here is the well-established rule that "every person owes every other person a duty imposed by law to be careful not to hurt him." Southeastern Greyhound Lines v. Callahan, 244 Ala. 449, 453, 13 So.2d 660, 663 (1943). In a variety of circumstances, this Court has recognized a duty to foreseeable third parties, based on a general "obligation imposed in tort to act reasonably." Berkel & Co. Contractors, Inc. v. Providence Hosp., 454 So.2d 496, 502 (Ala.1984) (citing cases). See, e.g., Havard v. Palmer & Baker Eng'rs, Inc., 293 Ala. 301, 306, 302 So.2d 228, 231 (1974) (engineering firm under a contract with the City of Mobile to inspect a tunnel owed a duty to third-party "member[s] of the public using" the tunnel to reasonably apprise the City of Mobile of the "condition of the fire-fighting equipment located in the [t]unnel"), overruled on other grounds, Ex parte Insurance Co. of North America, 523 So.2d 1064 (1988); see also Kelly v. M. Trigg Enters., Inc., 605 So.2d 1185, 1189 (Ala.1992) (a retailer, which sold an air freshener "composed of pure ethyl chloride" to a minor, who deliberately inhaled the substance while operating her automobile, owed a duty to motorists injured in a collision with the minor's vehicle).
Moreover, other jurisdictions have imposed duties specifically on physicians for the benefit of nonpatient members of the driving public. McKenzie v. Hawai'i Permanente Med. Group, Inc., 98 Hawai'i 296, 309, 47 P.3d 1209, 1222 (2002) (physician "owes a duty to non-patient third parties" to warn patients of possible adverse effects of prescribed medication on patients' driving ability, "where the circumstances are such that the reasonable patient could not have been expected to be aware of the risk without the physician's warning"); Joy v. Eastern Maine Med. Ctr., 529 A.2d 1364 (Me.1987) (physician who treated a patient by placing a patch over his eye owed a duty to motorists to warn the patient against driving while wearing the patch); Welke v. Kuzilla, 144 Mich.App. 245, 252, 375 N.W.2d 403, 406 (1985) (physician who injected a patient with an "unknown substance" owed a duty to motorists "within the scope of foreseeable risk, by virtue of his special relationship with [the patient]"); Wilschinsky v. Medina, 108 N.M. 511, 515, 775 P.2d 713, 717 (1989) (physicians owe a duty "to persons injured by patients driving automobiles from a doctor's office when the patient has just been injected with drugs known to affect judgment and *894 driving ability"); Zavalas v. State Dep't of Corr., 124 Ore.App. 166, 171, 861 P.2d 1026, 1028 (1993) (rejecting the argument "that a physician has no duty to third parties... who claim that the physician's negligent treatment of a patient was the foreseeable cause of their harm"); Gooden v. Tips, 651 S.W.2d 364, 369 (Tex.Ct.App.1983) ("under proper facts, a physician can owe a duty to use reasonable care to protect the driving public where the physician's negligence in diagnosis or treatment of his patient contributes to plaintiff's injuries"); Schuster v. Altenberg, 144 Wis.2d 223, 239-40, 424 N.W.2d 159, 166 (1988) (rejecting the argument "that a psychotherapist [has no] duty to warn third parties or to institute proceedings for the detention or commitment of a dangerous individual for the protection of the patient or the public"). But see Kirk v. Michael Reese Hosp. & Med. Ctr., 117 Ill.2d 507, 513 N.E.2d 387, 111 Ill.Dec. 944 (1987); Rebollal v. Payne, 145 A.D.2d 617, 536 N.Y.S.2d 147 (1988).
Recently, the Florida District Court of Appeals reversed a summary judgment in favor of a methadone clinic under circumstances factually similar to this case. Cheeks v. Dorsey, 846 So.2d 1169 (Fla.Dist.Ct.App.2003). That case involved an action against Pompano Treatment Center ("Pompano") by Theresa L. Cheeks, as personal representative of the estates of Jeffrey Williams and Travonda Williams, who were killed "in a car accident caused by Richard Reutlinger ..., a methadone patient of Pompano." Id. at 1170.
"The thrust of [Cheeks's] complaint was that Reutlinger was known to regularly abuse prescription and non-prescription drugs, that he did so on the evening of March 10, 1994 and in the early morning hours of March 11, 1994, and that, despite the fact that Reutlinger was impaired, Pompano administered the usual dose of methadone that morning without first testing Reutlinger's blood or urine to determine whether it contained drugs which might negatively interact with methadone. As a result, Reutlinger was too impaired to operate a motor vehicle and the methadone-induced impairment was the proximate cause of the ensuing accident. Appellant further alleged that Pompano knew or should have known that Reutlinger regularly abused drugs and that those drugs combined with methadone would create a `dangerous level of impairment.'
"[Cheeks] alleged, specifically, that the clinic breached its duty by (a) failing to properly conduct a drug screen urinalysis on Reutlinger; (b) failing to institute and follow policy and procedure for patient management while providing methadone treatment to Reutlinger; and (c) failing to perform proper screening of Reutlinger on March 11, 1994 which would have alerted staff to his impaired condition and led the staff not to administer methadone. [Cheeks] alleged that Pompano's breach of these duties constituted negligence, departed from the standard of care, and was the direct and proximate cause of the death of the decedents.
"....
"[In its summary-judgment motion,] Pompano asserted, among other things, that it could not reasonably be held liable to third parties, unidentified members of the driving public at large, who were injured by the addict's abuse of the methadone; therefore, it owed no duty to [Cheeks's] decedents who were unforeseen third parties. ...
"....
"Dr. [Joseph E.] Dorsey, owner of the methadone clinic, agreed that it would be a deviation from the prevailing standard of care to administer methadone to a patient who is known to be high. He stated that it is the policy of the clinic to *895 discharge such patients without medicating them.
"....
"After hearing arguments, the trial court granted Pompano's motion for summary judgment, ruling that Pompano did not owe a duty to the decedents, and entered a Final Summary Judgment in favor of Pompano."
846 So.2d at 1170-71.
In reversing the summary judgment, the court explained:
"This case is unlike a mere failure to warn case where the doctor prescribes a medication which might have certain effects under certain circumstances at some future time. In those situations, whether the patient takes the medication and then drives is beyond the doctor's control. In fact, whether the patient consumes the medication at all is beyond the doctor's control. Thus, imposition of a duty to unidentifiable third parties under those circumstances would create a zone of risk which would be impossible to define.
"On the other hand, this case presents a situation in which the variables are, or should be, known to the doctor or health care provider at the time the drug is administered, and the effects are immediate. When one administers a drug which, when combined with other drugs or alcohol, may severely impair the patient, the doctor's failure to take the proper precautions (i.e., verify whether the patient is already under the influence of another drug) is an affirmative act which creates the risk that unidentifiable third parties might be injured. Under these circumstances, there is, most certainly, a duty to unidentifiable third parties who may be injured as a result."
846 So.2d at 1173 (emphasis added).
The allegations in this case essentially parallel those in Cheeks. In that case, Cheeks alleged that the patient "was known to regularly abuse prescription and non-prescription drugs, that he did so [in close proximity to the time of the accident], and that, despite the fact that [he] was impaired, [the clinic] administered ... methadone ... without first testing ... [for] drugs which might negatively interact with methadone." 846 So.2d at 1170. Cheeks further alleged that the accident occurred because of negligent screening and negligent patient management. Id. The essence of the Taylors' complaint is (1) that Dr. Smith knew of the pervasive presence of prescription and nonprescription drugs, other than methadone, in Ennis's bloodstream at the time the methadone was administered; (2) that Dr. Smith, nevertheless, administered methadone on the morning of the accident; and (3) that the accident occurred because of Dr. Smith's negligent monitoring, supervision, and management of Ennis's treatment. Consistent with the cases imposing a duty in contexts comparable to this one, we conclude that the administration of methadone to an outpatient who has consistently tested positive for other drugs is an "affirmative act," which, in the absence of strong countervailing public-policy reasons, gives rise to a duty to third-party nonpatient motorists who may be injured in an automobile accident with the patient.
In that connection, Dr. Smith argues that public-policy considerations counsel against extending the duty of due care to third parties, because, he contends, it will "necessarily end out-patient methadone treatment in Alabama," with a consequent increase in substance abuse. Dr. Smith's brief, at 31-32. In particular, he states: "[I]t would not only be reasonably foreseeable, but an altogether certainty, that [patients such as Ennis] would seek drugs illegally, in an unsupervised and unmonitored setting, leaving society to deal with the costs and dangers attendant to such *896 illegal activity." Id. For a number of reasons, we find these arguments unpersuasive.
First, we note the following:
"The possibility (or perhaps what could be called a threat) that in some case or cases in the future some therapists may choose not to accept some potential patients for therapy in their private practice ... should not forever preclude victims of torts ... referable to the breach of duty of such therapists from being without any remedy whatever."
Gooden, 651 S.W.2d at 372 (emphasis added). Extending a duty to a nonpatient motorist who is injured in an automobile accident with the director's patient will not create a new or different standard of care. This is so because, although the Act does not specifically contemplate this action, the physician's duty to the third party nevertheless derives from the physician's duty to the patient. Indeed, the Taylors concede that "`if Dr. Smith's treatment of Ms. Ennis met the standard of care, then he certainly could not be found liable for Ms. Ennis'[s] car accident afterward.'" Taylors' reply brief, at 32 (quoting Dr. Smith's brief, at 17). Thus, "[m]edical standards for the administration of drugs [and the monitoring of patients] must define the duty owed by [Dr. Smith], both ... to his patient, and to the [Taylors]." Wilschinsky, 108 N.M. at 516, 775 P.2d at 718. "[W]e impose no onerous burden by insisting that a physician abide by the standards of care of his profession." Welke, 144 Mich.App. at 254, 375 N.W.2d at 406.
To be sure, this action does not trigger the provisions of the Act, or, in particular, the special protections afforded health-care providers under the Act. However, should the Legislature deem it appropriate to include this species of action in the Act, it can amend the Act to overrule, in effect, Thomasson v. Diethelm, supra, and so provide. Thus, the relationship-between-the-parties consideration, Morgan, 466 So.2d at 114, characterized in this case by the derivative nature of the duty to third parties and the unitary standard of care, weighs in favor of recognizing a duty under these facts.
Second, if Ennis is typical of outpatients in methadone therapy, it is implausible that the existence of a duty would have a deleterious effect on the incidence of substance abuse, as Dr. Smith suggests. This is so, because, despite her methadone treatments, Ennis continued to use  in addition to marijuana  Xanax and Valium, which, the Center assumed,[3] were obtained illegally, both before and after the accident. Although she acknowledged in the contract she entered into with the Center the importance of counseling, she declined to participate in group counseling sessions, and expressed "no desire to stop using." Indeed, a urinalysis on September 6, two days before the accident in which Lola Taylor was injured, revealed the presence of benzodiazepines and methadone. Thus, she was receiving methadone, not in lieu of illegal drugs, but in addition to them.
Dr. Smith's argument is, therefore, a non sequitur. The imposition of a duty of due care on directors of methadone clinics should not aggravate the incidence of substance abuse. On the contrary, it could only discourage the sort of abuse involved in this case.
The alleged "nature of the defendant's activity," Morgan, 466 So.2d at 114, in this class of case, that is, the administration of *897 methadone on an outpatient basis without taking reasonable precautions, "is an affirmative act," Cheeks, 846 So.2d at 1173, which involves the administering physician directly in the foreseeable consequences. This factor, also, weighs in favor of imposing a duty.
Finally, the circumstances here presented obviously involve a high potential for severe personal injury, death, and property damage. The policy considerations cited by Dr. Smith do not justify the risk of releasing a dangerously medicated patient upon the highways of Alabama, without potential liability to the physician who directly administered the medication.
Having considered the foreseeability of injury, the type of activity, the relationship of the parties, and the type and degree of potential harm, Morgan, 466 So.2d at 114, we hold that the duty of care owed by the director of a methadone-treatment center to his patient extends to third-party motorists who are injured in a foreseeable automobile accident with the patient that results from the director's administration of methadone.[4] The trial court erred, therefore, in entering a summary judgment for Dr. Smith. Consequently, that judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
LYONS, JOHNSTONE, and HARWOOD, JJ., concur.
HOUSTON, SEE, and STUART, JJ., concur in the result.
HOUSTON, Justice (concurring in the result).
In this case, we are faced with the prospect of expanding a physician's duty to third-party nonpatients as a result of a physician's treatment of his patient. The majority opinion has cited cases from other jurisdictions doing so. There are also cases in other jurisdictions that have refused to do so: Rebollal v. Payne, 145 A.D.2d 617, 618, 536 N.Y.S.2d 147, 148 (1988) ("There is no duty on the part of the operator of a methadone clinic to control the travel activities of a methadone patient giving rise to liability for accidents to a third party...."); Werner v. Varner, Stafford & Seaman, P.A., 659 So.2d 1308 (Fla.Dist.Ct.App.1995); Webb v. Jarvis, 575 N.E.2d 992 (Ind.1991); Kirk v. Michael Reese Hosp. & Med. Ctr., 117 Ill.2d 507, 513 N.E.2d 387, 111 Ill.Dec. 944 (1987); Estate of Warner v. United States, 669 F.Supp. 234 (N.D.Ill.1987).
I acknowledge that in charting the path for this jurisdiction we are making a public-policy decision. This case is beyond the scope of the Alabama Medical Liability Act, the expressed intent of which is "to insure that quality medical services continue to be available at reasonable costs to the citizens of the State of Alabama." (Ala.Code 1975, § 6-5-540.) Therefore, there is no direct legislative policy. Courts in other jurisdictions (Kirk v. Michael Reese Hosp. & Med. Ctr., supra; Lester v. Hall, 126 N.M. 404, 970 P.2d 590 (1998)), have developed a balancing test, not unlike the test this Court has used in making other public-policy decisions (see Tittle v. Giattina, Fisher & Co., Architects, Inc., 597 So.2d 679 (Ala.1992): 1) the likelihood of injury in similar cases; 2) the magnitude of the burden of guarding against liability; and 3) the potential consequences of placing that burden on the defendant).
I would hold that a physician would not be liable to a third-party nonpatient unless the physician's negligence in the treatment, *898 supervision, or warning of his patient proximately caused the injuries to the third-party nonpatient. The Taylors allege that this is what Dr. Smith did. The testimony of Dr. Nathan Strahl supports that allegation. Therefore, the summary judgment should not have been granted in favor of Dr. Smith, and I concur in the reversal of that summary judgment.
NOTES
[1] This case was originally assigned to another Justice. It was reassigned to Justice Woodall on December 19, 2003.
[2] "Methadone is a `synthetic narcotic drug ... that blocks the effects of heroin and may be used as a heroin substitute in the treatment of heroin addiction and as a painkiller.' "MX Group, Inc. v. City of Covington, 293 F.3d 326, 329 n. 1 (6th Cir.2002) (quoting The Random House College Dictionary 841 (rev. ed.1982)).
[3] Specifically, Rebecca Clayton, a "corporate representative" for the Center, testified by deposition that, based on information Ennis provided to the Center, Clayton assumed that Ennis was obtaining Xanax and Valium illegally. Indeed, it is unrefuted that her use of benzodiazepines during her treatment at the Center was illicit.
[4] This holding is restricted to the "duty" element of negligence in this case; it does not speak to the elements of breach of duty or proximate cause.