Lang, James E., J.
A. Introduction
On the morning of May 22, 2009, shortly after receiving methadone at a Peabody, Massachusetts outpatient opioid addiction treatment center owned and operated by the defendant, Community Health Care, Inc., d/b/a Community Substance Abuse Centers (“CSAC”), John Doe[1] was involved in a three-vehicle accident on Route 128 South in Burlington, Massachusetts. The Ford pickup truck he was operating collided with a Ford Explorer in an adjacent lane, which vehicle in turn then collided with a Dodge Durango in which Jose Francisco Vasquez, Juan Condori, Carlos Maza, and Alberto Maza were passengers. Condori and Alberto Maza were killed and Vasquez and Carlos Maza were injured in the roll-over accident. They and their representatives have brought suit against CSAC, alleging that the latter was negligent in its care and treatment of Doe and that such negligence was the proximate cause of their injuries and deaths.[2] CSAC has moved pursuant to Mass.R.Civ.P. 56 for summaiy judgment.[3] A nonevidentiaiy hearing was conducted on June 23, 2014. For the reasons stated below, CSAC’s summaiy judgment motion is DENIED in part and ALLOWED in part.
B. General Legal Principles
A motion for summary judgment should be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Mass.RCiv.P. 56(c). The moving party, here the defendant, bears the burden of affirmatively demonstrating the absence of a triable issue and that the record entitles it to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). “The court must view the evidence in the light most favorable to the party against whom summary judgment is sought and draw all reasonable inferences in [its] favor.” Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also Sullivan v. Liberty Mutual Ins. Co., 444 Mass. 34, 38 (2000) (same).
A party who does not bear the burden of proof at trial, like the defendant, may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing parly’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 714 (1991).
Once the moving party “establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact.” Pederson, 404 Mass. at 17. “The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). “Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summaiy judgment.” Id. at 248. “Summary judgment will not lie if the dispute about a material fact is ‘genuine,’ that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.” Id. The nonmoving party cannot defeat a motion for summaiy judgment by resting on the pleadings and mere assertions of disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). In deciding motions for summary judgment, the court may consider pleadings, deposition transcripts, answers to interrogatories, admissions on file, and affidavits. Mass.R.Civ.P. 56(c). “[A]ffidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.” Mass.R.Civ.P. 56(e); see also Madsen v. Irwin, 395 Mass. 715, 719 (1985) (“The requirements of Rule 56(e) are mandatoiy”). The court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. Attorney General v. Bailey, 386 Mass. 367, 370-71 (1982).
To prevail on their claim for negligence, the plaintiffs must show by a preponderance of the evidence *252 that CSAC owed them a duty, that CSAC breached that duty, that they were damaged, and that CSAC’s negligence caused their damage. See Glidden v. Magilio, 430 Mass. 694, 696 (2000).
C. Discussion
1. Alleged Breach of Duty to Warn
CSAC’s summary judgment motion is premised on its contention that in the circumstances of this case it owed but one duty to the plaintiffs, with whom it had no relationship, i.e., the duty to warn its patient Doe of the side effects of the methadone it administered to him, that it did not breach that duty, and that, in any event, evidence that anything it did or failed to do was a legal cause of the accident in question is fatally lacking. The court will first consider whether there is a genuine dispute of material fact regarding the alleged breach of this acknowledged duty to warn, before considering the plaintiffs’ other negligence theories.
“[A] medical professional (other than a mental health professional) owes no duty to a third person arising from any claimed special relationship between the medical professional and a patient.” Medina v. Hochberg, 465 Mass. 102, 103-04(2013), citing Leavitt v. Brockton Hospital, Inc., 454 Mass. 37, 42 (2009). Nevertheless, in Coombes v. Florio, 450 Mass. 182, 877 N.E.2d 567 (2007), the Supreme Judicial Court announced what it subsequently referred to in Medina as a “narrow rule . . . that a physician owes a limited duty to third parties, foreseeably at risk from a patient’s decision to operate a motor vehicle, to warn the patient of the known side effects of medications the physician has prescribed that might impair the patient’s abilily as a motorist.” Medina, 465 Mass. at 104. Coombes was a plurality decision, which was described thusly in Medina (a decision authored by Justice Cordy, one of the Coombes dissenters):
A majority of the court concluded that a physician may be liable to a third parly for failing to warn his or her patient of the known side effects of medication prescribed by the physician that might affect the patient’s ability to drive a motor vehicle. See [Coombes, 450 Mass.) at 190, 194, 877 N.E.2d 567 (Ireland, J., concurring); id. at 196, 877 N.E.2d 567 (Greaney, J., concurring in part and dissenting in part). The court’s holding represented the common ground between Justice Ireland’s conclusion that “a physician owes a duty of reasonable care to everyone foreseeably put at risk by his failure to warn of the side effects of his treatment of a patient” (emphasis added), id. at 190, 877 N.E.2d 567 (Ireland, J., concurring), and Justice Greaney’s narrower stance that “a physician who has knowledge of a danger that may be posed to others from a patient’s decision to operate a motor vehicle while under the influence of prescribed medication [and who] does not warn the patient of the risks involved . . . may be held liable for injuries to others caused by the failure to warn” (emphasis added). Id. at 196, 877 N.E.2d 567 (Greaney, J., concurring in part and dissenting in part).
The rationale of Justice Greaney’s narrow explication of the duty was based on the principle that “[t]o a physician, it is the patient. . . who must always come first,” id. at 197, 877 N.E.2d 567 (Greaney, J., concurring in part and dissenting in part), and on the concern that a broader duty to warn of side effects of treatment would place a physician in the untenable position of mediating between his or her loyalty to a patient, on the one hand, and avoiding liability to nonpatients, on the other. Id. (“A physician should not, in ordinary circumstance, be held legally responsible for the safety of others on the highway, or elsewhere, based on medical treatment afforded a patient”). Even so, he reasoned that “[e]xtending the scope of liability for the benefit of third parties foreseeably put at risk by an uninformed patient’s decision to drive alters neither the physician’s medical decision to prescribe medication nor the physician’s legal duty under the Cottam [v. CVS Pharmacy, 436 Mass. 316, 321 (2002)], decision to warn the patient about adverse side effects.” Id. at 198, 764 N.E.2d 814. Thus, in his view, such a duty would not intrude on the physician-patient relationship. Id.
Medina, 465 Mass. at 107-08 (footnote omitted).[4]
CSAC contends that the court should conclude as a matter of law on the record presented that CSAC satisfied the Coombes duty to warn. It points primarily in that regard to materials and documents that Doe was provided and/or signed during his intake at CSAC on March 4, 2009, the first day of his methadone treatment. Among these materials, Doe signed a Release and Consent Form for Methadone Treatment that stated that he understood: that many medications, substances of abuse, and alcohol can alter the effect of methadone; that new patients should not drive until they are on a stable dosage of methadone for a minimum of three days; that if he has a dosage change he should not drive until the full effect of the change is determined, which may take up to three days or more; and, that he should not drive if he is drowsy. In signing that form, Doe also acknowledged therein that he had been cautioned not to drive if he was using other medications, alcohol, or substances of abuse until the effects of those factors could be determined. At intake, Doe also signed a Medical Admission Note, in which he acknowledged that he had had explained to him the risks of driving during the induction phase of his treatment and the risk of the sedating effects of additional medications. CSAC cites as well a medical note indicating that Doe had been warned that methadone can be sedating during the stabilization phase of treatment, that he should avoid driving during that phase, and that continued use of illicit drugs can also cause sedation. Similarly, CSAC also cites a passage in a patient manual that *253 was given to Doe at intake, which advises patients not to drive if drowsy and in need of a lowering of their methadone dosage, or if asking for an increase because of symptoms. Separate and apart from the materials presented to Doe at intake, CSAC notes that a sign was posted next to each dosing window, in plain view of Doe every day when receiving his methadone, which parroted the cautionary information contained in the Release and Consent Form. Finally, CSAC maintains that in his deposition testimony Doe averred, in effect, that he understood the warnings that were presented to him at intake.
The plaintiffs respond that a jury question is presented whether the warnings that CSAC provided to Doe were adequate to discharge its duty under Coombes. The court agrees. What warnings that were given came on Doe’s first day of treatment at the center, when, by his own acknowledgment, he was an active heroin user. He was presented with a patient manual and with standard forms to sign, which he did. He testified that he does not really remember his intake interviews or what was said thereat. To the extent that he professed any memory of the substance of the materials he was provided or of what he was told by the CSAC staff, he stated that he recalls being told that methadone could impair him in some way, but he did not believe that falling asleep, passing out, or sedation were mentioned as possible side effects. Nor did he recall being told that if his dosage was increased he should not drive until the full effect of the dosage change could be determined, which could take up to three days or more.[5] A jury might justifiably conclude that such warnings were intended more to provide legal protection to CSAC than to meaningfully and effectively communicate information to the center’s patients. Put another way, a jury could permissibly determine that such warnings were ineffectual and therefore inadequate.
Even if the materials provided to Doe at intake were sufficient to discharge CSAC’s duty to warn at that juncture, a jury issue is presented as to whether additional warnings were required during the course of Doe’s ensuing two and a half months of treatment, especially given the issues that arose during his tenure as a CSAC patient. After his initial intake and prior to the date of the accident, Doe tested positive twice for illicit drug use: for opiates on March 28, 2009 and for cannabinoids on April 25, 2009.[6] He missed multiple counseling sessions in March 2009, and on March 23, 2009 he was given an administrative warning regarding his non-attendance. In early May 2009 he was referred to a noncompliance group because of more recent non-attendance issues. In a May 19, 2009 meeting with a counselor, Doe exhibited signs of illicit drug usage (glassy eyes, pressured speech, restlessness, etc.). At the same time, throughout the course of his treatment at CSAC, Doe’s daily methadone dosage was increased in multiple graduated steps from 30 mg at the outset to 120 mg as of the date of the accident. The last increase occurred on May 20, 2009, when Doe’s dose was upped from 110 mg to 120 mg. He did not receive any new warnings concomitant with any of the dosage increases, even though, by definition, he became an unstabilized patient at every dosage change and for at least three days thereafter. On May 21, 2009, the day after the last increase was instigated, Doe failed to appear for his dose, raising yet another cause for concern. Despite this recited history of non-compliance with center rules and protocols, and despite the fact that he was within the unstable period associated with a recent dosage increase, when Doe presented himself at CSAC on the morning of May 22, 2009, the date of the accident, he was given his methadone without any advisory of any kind being issued regarding the effects of the new dosage, alone or in combination with illicit drugs, upon his ability to safely operate a motor vehicle. As for the signs that were posted at the dosing windows, the jury could supportably find that they did not suffice to discharge CSAC’s duty, as an express warning to Doe was required (notably, Doe testified that he only recalls the signs warning patients not to talk and that he does not recall them warning patients not to drive if impaired or drowsy). In sum, on the record before the court there exists a genuine dispute of material fact regarding whether CSAC breached its duty to warn by failing to administer a new warning or warnings to Doe during the course of his treatment, or, at the very least, when his dosage was last increased.[7]
CSAC also argues that the plaintiffs evidence on the causation element is legally insufficient, both as to the issue of whether Doe was impaired as a result of his ingestion of methadone and as to whether it was he who caused the accident. The court finds this argument unpersuasive. Construing the evidence in the light most favorable to the plaintiffs, the facts supporting causation include the following: Doe had cannabinoids and benzodiazepines in his system that morning; he then received his second dose of methadone at the new 120 mg level, the highest it had been at any time during his treatment, and this was just two days after the increase was made; less than 30 minutes after ingesting the methadone, he was involved in the accident; a witness to the accident, Daniel Lawrence, observed Doe’s truck drift into the adjacent lane for no apparent reason and strike the rear of the Explorer, sending that vehicle careening into the Durango in which the plaintiffs were riding, thereby causing it to roll over; Doe fled from the scene to the parking lot of a nearby athletic club, and when questioned there by State Police officers a short time later he lied about whether he had been in an accident (the flight and falsehoods arguably reflect a consciousness of guilt or of liability on his part); a state police accident reconstructionist, Sergeant John Bibeau, determined that Doe caused the accident; Doe was cited *254 by the police for nine violations and offenses, including motor vehicle homicide, leaving the scene of an accident causing personal injury, and failure to stay within marked lanes; and, Doe pled guilty to those offenses and received a state prison term of incarceration. Unquestionably, from these facts a jury could permissibly conclude that Doe’s negligent driving conduct was the predominant cause of the accident, even if, as the plaintiffs alleged, the other two drivers were each speeding.
As to whether Doe’s negligent driving was a consequence of his impairment from the methadone, a jury could find that it was. There was a very close temporal proximity between when Doe received his dose that morning and the ensuing accident, his dosage had just been increased and he had not yet acclimated to it, and his observed driving behavior — his vehicle drifting into the next lane — was consistent with drowsiness (which, of course, is one of recognized side effects of methadone). These facts in and of themselves are strongly supportive of a finding of causally-related impairment. The putative testimony of the plaintiffs’ experts adds to the quantum of evidence in that regard, and it certainly precludes summary judgment for CSAC.[8] The two doctors, collectively, opine that Doe was unstable at the time of the accident, that his tolerance for the newly-upped dosage was lowered by having missed his dose the day before, that the cannabinoids and benzodiazepines in his system may have enhanced the sedative side effects of the methadone, and that he was in fact impaired at the time of the accident by the narcotic effect of the methadone he had been given. In short, there is a genuine dispute of material fact regarding the causation element.[9]
2. Alleged Breach of Duty of Reasonable Care
Apart from CSAC’s alleged violation of its duly to warn Doe of the impact of his upped methadone dosage upon his ability to safely operate a motor vehicle, the plaintiffs contend that CSAC was negligent in various other ways regarding its treatment of Doe during his tenure as a clinic patient. The instances of its purported deviation from the applicable standard of care for methadone treatment of opioid addiction are chronicled by the plaintiffs proffered experts, Drs. Seewald and McKay, in their respective reports. These asserted deviations include the following: the delegation of dosing increase decisions to counselors and nurses rather than doctors; the practice of waiting up to 72 hours for a doctor or nurse practitioner (“NP”) to review and approve methadone dosage change orders; the adoption of non-patient specific standing medical orders regarding methadone dosing; the issuance of methadone dosage change orders by licensed practical nurses (“LPNs”) based on the recommendations of a counselor and without reviewing treatment notes, toxicology results, or other relevant information; the destruction of CSAC Internal Referral Forms relating to the initiation of dosage changes, which is relevant information to assess the propriety of dosage changes; Dr. Susan Moner’s issuance of a standing order when Doe was admitted to CSAC to increase his methadone dosage in graduated steps during his first two months of treatment; the failure of staff to follow Dr. Moner’s order to begin tapering the dosage levels on May 5, 2009, after two months of such dosage increases; the failure to conduct a comprehensive dosage assessment when Doe’s dosing level reached 80 mg per day; the failure to conduct a treatment plan review at 30-day intervals; the failure of the interdisciplinary team, with a clinic doctor, to conduct a case conference to address Doe’s conduct in missing counseling sessions and daily doses; the failure to tailor an individual drug screening program for Doe; the failure to properly address with Doe his abnormal drug screens; the failure to perform weekly drug screens that were ordered; the failure of a doctor to review the drug screens, especially before signing off on an order to increase the methadone dosage; the failure to issue a warning to Doe of the possible effects of illicit drugs with methadone each time there was a positive drug screen; the failure to question Doe as to why he was seeking continually increased methadone dosages after he reached the 90 mg per day level and drug screens indicated he was no longer using opiates; the failure of CSAC nurses to review counseling notes prior to adjusting Doe’s methadone dosages; the failure to order a toxicology screen on May 19, 2009 or to notify the medical staff after a counselor observed signs and symptoms indicative of possible illicit drug use by Doe; the failure to question Doe about why he missed his second-day dose at the new 120 mg level; and, the failure to review the counselor’s note about the May 19, 2009 counseling session before administering the 120 mg dose on May 22, 2009.
Based on the putative testimony of Drs. Seewald and McKay, as well as the CSAC records and the testimony of CSAC staff, including Dr. Moner, NP Kevin King, LPN Darlene Anderson, and LPN Amy Poirier, the plaintiffs assert, in essence, that CSAC was negligent in upping Doe’s methadone dosage to 120 mg on May 20, 2009 and negligent in administering that dose level to him on May 22, 2009. The record establishes that there is a genuine dispute of material fact presented concerning whether CSAC was in fact negligent in those respects.
The fundamental issue presented by CSAC’s summary judgment motion is whether the duty of reasonable care that CSAC clearly owed to Doe in its care and treatment of him extends to the plaintiffs as non-patient third parties who were harmed by CSAC’s alleged breach of that standard of care.[10] The duty at issue, one involving alleged misfeasance rather than nonfeasance, is different in kind than the duty recognized by the court in Coombes, and it is one that has yet to be squarely addressed by our appellate courts. Thus, this court must determine whether a duty of care was owed to the plaintiffs in the circumstances here pre *255 sented.[11] See O’Sullivan v. Shaw, 431 Mass. 201, 203 (2000), citing Davis v. Westwood Group, 420 Mass. 739, 743 (1995) (“Whether a defendant has a duty of care to the plaintiff in the circumstances is a question of law for the court, to be determined by reference to existing social values and customs and appropriate social policy”). In Jupin v. Kask, 447 Mass. 141, 146-47 (2006), the Supreme Judicial Court set forth the applicable principles that guide the determination of the existence of a duty, stating,
No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.
Luoni v. Berube, 431 Mass. 729, 735, 729 N.E.2d 1108 (2000), quoting W.L. Prosser &W.P. Keeton, Torts §53, at 358-59 (5th ed. 1984).
We have recognized that “[a]s a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others.” See Remy v. MacDonald, [440 Mass. 675,] 677, 801 N.E.2d 260 [2004], citing Restatement (Second) Torts §302 comment a (1965). Aprecondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor. See Foley v. Boston Hous. Auth., 407 Mass. 640, 646, 555 N.E.2d 234 (1990), quoting Husband v. Daboecia, 26 Mass.App.Ct. 667, 669, 531 N.E.2d 600 (1988) (“There is no duty owed when the risk which results in the plaintiffs injury is not one which could be reasonably anticipated by the defendant”). See also Husband v. Daboecia, supra (determination whether person has duty to protect another from harm caused by third party “involve [s], to some extent, the foreseeability of the harm”). Consequently, with some important exceptions, “a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.” Tarasoff v. Regents of the Univ. of Cal., [17 Cal.3d 425], 434-35, 131 Cal.Rptr. 14, 551 P.2d 334 [1976]. See Restatement (Second) Torts §284 (1965) (“Negligent conduct may be ... an act which the actor as a reasonable man should recognize as involving an unreasonable risk of causing an invasion of an interest of another...” [Emphasis added.]) ‘To the extent that a legal standard does exist for determining the existence of a tort duty ... it is a test of the ‘reasonable foreseeability’ of the harm.” McClurg, Armed and Dangerous: Tort Liability for the Negligent Storage of Firearms, 32 Conn.L.Rev. 1189, 1230 (2000) (McClurg).
See also Commerce Insurance Company v. Ultimate Livery Service, Inc., 452 Mass. 639, 646 (2008).
There can be no serious question that it was foreseeable to CSAC that its negligent administration of methadone to any of its patients, Doe included, could result in harm to members of the public in the precise manner in which the plaintiffs were alleged to have been harmed in the instant case. The materials that CSAC provided to Doe at his intake and the forms that he was required to sign make manifest the foreseeability that a patient could be impaired by the ingestion of methadone, alone or in combination with illicit drugs, and that such impairment would make driving dangerous to himself and to others on the road. It is precisely for that reason that patients are advised not to drive when they are in a destabilized period, either because they have not yet adjusted to their methadone dosage or because the impact of their illicit drug usage is undetermined. If the existence of a duty to the plaintiffs turned solely on whether harm to them from Doe’s impaired operation of a motor vehicle was foreseeable to CSAC, the court would have no difficully finding such a duty.
The court must, however, also consider the ramifications of extending liability for negligent care and treatment of a patient beyond the patient himself to third parties such as the plaintiffs. In doing that, it recognizes that the Supreme Judicial Court has understandably been hesitant to impose duties on physicians to non-patients. Coombes itself was a plurality decision, and in Medina the full court unanimously declined to condone what it characterized as “an unwarranted expansion of Coombes” by creating a new duty on the part of doctors to third parties to warn their patients of the effects of underlying medical conditions. 465 Mass. at 111. In so doing, the Medina court not only considered the important legal distinction between an affirmative act by a doctor in prescribing a medication and the mere treatment of a patient’s illness, but it “weighted] the benefits of [the proposed duly to warn] against the countervailing costs of intruding into the highly personal, confidential physician-patient relationship.” Id. at 110. It reasoned that “such a duty would threaten the autonomous nature of the physician-patient relationship by causing a physician to ‘become less concerned about the particular requirements of any given patient, and more concerned with protecting himself or herself from lawsuits by the potentially vast number of persons who will interact with and may fall victim to that patient’s conduct outside of the treatment setting.’ ” Id., quoting Coombes, 450 Mass, at 211 (Cordy, J., dissenting). It also noted that the recognition of such a duly would “invite significantly increased litigation by third parties against doctors, resulting in an attendant increase in expenses at a time when our health care system is already overwhelmed with collateral costs,” and it would “ ‘threaten the confidentiality inherent in the doctor-patient relationship’ by potentially requiring a physician to reveal private medical records concerning a patient’s underlying medical condition in order to comply with inevitable discovery requests.” 465 Mass. at 100-11, quoting Coombes, 450 Mass. at 213 (Cordy, J., dissenting).
*256 The concerns articulated by the court in Medina militate against recognition of a duty by CSAC to the plaintiffs in the instant case to treat Doe within the applicable standard of care for methadone treatment of opioid addiction. But the court does not find those concerns to be determinative for two reasons. First, the court views this case to be more akin to Coombes than Medina. Here, as in Coombes, liability would be based on the act of prescribing a drug with known side effects that could foresceably endanger the public. In addition, as in Coombes, the costs and burdens of imposing a duty owed to individuals other than a patient are limited because existing tort law already imposes on a doctor the very same duty of reasonable care and therefore “requires nothing from a doctor that is not already required.” 450 Mass, at 191. In Coombes, the court also reasoned that recognition of the duty to warn there in issue served to protect the public from the very harm that created the parallel duly to the patient, the foreseeable risk that known side effects of a drug will impair a patient’s ability to drive. 450 Mass, at 191. Here the imposition of a duty of reasonable care upon CSAC and other methadone providers would likewise serve to protect the public (although the duty to warn at issue in Medina arguably would likewise have been beneficial to public safety).[12] Second, and more importantly, this case involves a unique, somewhat non-traditional doctor-patient relationship, one that is characterized by minimal direct contact between the two and a heightened risk to third parties in the event of a breach of the standard of care. CSAC is a high-volume clinic that dispenses methadone to hundreds of patients a day, typically with no contact whatsoever between the patients and a doctor (Doe himself met with Dr. Moner at the time of his admission in early March 2009 and never saw a doctor again during the course of his treatment, and he never even met Kevin King, the NP who authorized the last methadone dosage increase). It is different in kind from the “highly personal, confidential physician-patient relationship, recognized since the time of Hippocrates, circa 400 B.C.” that Justice Cordy spoke of in his Coombes dissent. 450 Mass, at 206 (Cordy, J., dissenting). Moreover, CSAC’s patients are, by definition, addicted to opiates such as heroin, with all of the attendant behaviors that are symptomatic of such an affliction. Accordingly, they present an especially high likelihood that they will use illicit drugs while receiving methadone treatment, seek excessive and medically unjustified dosages of methadone, disregard warnings and treatment instructions, and violate criminal and civil laws, including those pertaining to the operation of motor vehicles. Because they are at a greatly elevated risk to be impaired as a result of their methadone treatment, and to drive in that condition, this case cannot be analyzed solely through the prism of the doctor-patient relationship. Rather, it bears some kinship to those cases outside the medical context that have involved a foreseeable risk of an impaired driver causing an automobile accident and in which the Supreme Judicial Court has extended a duty of reasonable care to all those involved. See Coombes, id., citing Michnik-Zilberman v. Gordon’s Liquor, Inc., 390 Mass. 6, 7-8, 10-12 (1983); Jesionek v. Massachusetts Port Authority, 376 Mass. 101, 106 (1978); Adamian v. Three Sons, Inc., 353 Mass. 498, 501 (1968).
The plaintiffs, who urge the court to recognize that CSAC’s duty of reasonable care can give rise to liability to them for the foreseeable harm they sustained from its breach, cite two out-of-state appellate cases, both involving methadone clinics, Taylor v. Smith, 892 So.2d 887 (Ala. 2004), and Cheeks v. Dorsey, 846 So.2d 1169 (Fla.Dist.Ct.App. 2003) (a case cited and relied upon by the Alabama Supreme Court in its decision in Taylor). In both cases, the plaintiffs were injured (Taylor) or killed (Cheeks) in roadway collisions with vehicles driven by methadone patients who had a history of positive drug screens for illicit drug use and who nevertheless were given methadone from the defendant doctors/clinic shortly before the accidents. Both courts reversed grants of summary judgment that had been based on the lower courts’ determinations that no duty was owed to the plaintiffs, and both appellate courts held that a doctor who breaches his duty of care in the administration of methadone may be liable to unidentifiable third parties who are injured as a result. Taylor, 892 So.2d at 895; Cheeks, 846 So.2d at 1173. This court concurs.[13] Thus, CSAC’s motion for summary judgment as to the plaintiffs’ claim relating to CSAC’s alleged negligent administration of methadone to Doe is denied.
3. Alleged Breach of Duty to Control
The plaintiffs final theory of liability fares differently. The plaintiffs allege that CSAC was negligent in failing to prevent Doe from driving on the date in question, either by taking his car keys away or by summoning the police. Recognizing that, outside of the mental health care context, the Supreme Judicial Court has expressly rejected the notion that a medical care provider owes a duty to a third person arising from a special relationship between the medical professional and his or her patient, see Leavitt, 454 Mass, at 42, the plaintiffs nevertheless assert that by virtue of the agreement that Doe signed as a CSAC patient, such a special relationship arose in this case. They aver that the agreement granted CSAC the authority to take Doe’s keys if it determined that he was unfit to drive or to call the police if he was resistant, which they characterize as CSAC voluntarily assuming a duty to take charge of and control Doe. They also contend that CSAC’s employment of mental health counselors created a special relationship with Doe that begat such a duty as well. The court finds these arguments unpersuasive, largely for the reasons cited by CSAC in its supplemental memorandum in support of summary judgment.
*257 In summary, the “contract” between Doe and CSAC, which was terminable at any time, did not give rise to a duty on CSAC’s part to prevent Doe from driving, and certainly not one that created tort liability to third parties. Nor is CSAC’s utilization of mental health counselors of any moment, as no so-called Tarscuojf issue is raised on the facts presented. More fundamentally, this particular theory of liability that the plaintiffs advance is contrary to the established principle that a physician has no “duty to control a patient’s behavior once that patient departs from the physician’s office.” Coombes, 450 Mass, at 198 (Greaney, J., concurring). See also Leavitt, 454 Mass, at 40-41 (“Absent a special relationship with a person posing'a risk, there is no duty to control another person’s conduct to prevent that person from causing harm to a third party, and as we shall explain, there is no special relationship between the hospital and the patient that would give rise to such a duty in the circumstances of this case . . . We have not previously recognized, and do not now recognize, a duty to a third person of a medical professional to control a patient (excluding a patient of a mental health professional . . .) arising from any claimed special relationship between the medical professional and the patient”).[14] Finally, there is inadequate evidence in the summary judgment record to establish that at the time that Doe received his methadone dose on May 22, 2009, or immediately thereafter, he manifested signs of impairment that would have triggered a duty on CSAC’s part to take his car keys or to call the police, even if such a duty existed. Indeed, there is no evidence that Doe was visibly impaired at all. For this reason as well, the court must grant summary judgment to CSAC as to this theory of negligence liability.
ORDER
For the foregoing reasons, the defendant CSAC’s motion for summary judgment is DENIED regarding the plaintiffs’ claims: (1) that CSAC was negligent in failing to issue adequate warnings to Doe against operating a motor vehicle after ingestion of methadone; and (2) that CSAC was negligent in its administration of methadone to Doe. CSAC’s motion for summary judgment is ALLOWED regarding the plaintiffs’ claim that CSAC was negligent in failing to prevent Doe from driving.

Pursuant to an Order entered on March 30, 2011, in all public filings in this case all identifying information regarding this individual is to be redacted. Accordingly, herein the court refers to this individual as John Doe.

The plaintiffs also sued the driver of all three vehicles, Doe, Jose Martinez (the Explorer operator), and Alberto Fernandez (the Durango operator), alleging that each was negligent. Doe and Martinez settled at mediation and a default judgment entered against Fernandez.

The summary judgment principles to be applied are stated in Kourouvacilis v. General Motors Corp., 410 Mass. 706 (1991).

In Coombes, the decedent died from injuries he sustained after being struck by a car driven by an elderly man, David Sacca, who lost consciousness while driving. Sacca had been prescribed a number of medications by the defendant doctor, yet the latter had issued no warnings to Sacca regarding the hazards of driving despite the known sedating effects of such medications. 450 Mass, at 184-86. In Medina, the court declined to extend the duty recognized in Coombes to the situation there presented, in which the plaintiff was struck and injured by a patient, Robert Riskind, who, while operating his car, suffered a grand mal seizure relating to an inoperable brain tumor from which he was suffering. 465 Mass, at 102-03. The defendant doctor treating Riskind had not warned him of the dangers of operating an automobile based on his underlying condition, and the court concluded that he had no duty to third persons such as the plaintiff to do so. The court noted that the duty recognized in Coombes devolved from the affirmative act of the doctor in prescribing medications with known and quantifiable side effects, whereas in Medina the condition that created the driving risk was naturally occurring and unrelated to any conduct on the doctor’s part. Id. at 109-11.

To be sure, Doe’s deposition testimony provides some support for CSAC’s contention that Doe was properly warned about the side effects of methadone, either alone or in combination with other dmgs, including its possible impairment of his ability to safely operate a motor vehicle, and that he understood such warnings. For example, he testified that he read the intake documents before signing them and that he went over the packet he received with “Mr. Perrault” and with his parents. He further related that he was cautioned before signing the documents not to drive if using other medications, alcohol, or illicit substances until their effect could be determined and not to drive until on a stable methadone dosage. He further testified that he knew he was not supposed to drive if drowsy but that he never encountered that condition.
Nevertheless, his testimony was often ambiguous and inconsistent. Read as a whole, it certainly does not mandate a conclusion as a matter of law that the warnings given to him at intake were adequate or that he understood them.

On the date of his admission to CSAC, March 4, 2009, Doe tested positive for opiates and cannabinoids. On the date of the accident, May 22, 2009, he tested positive for benzodiazepines and cannabinoids, though those results were not know by CSAC until five days later.

Coombes and its progeny have not defined with specificity exactly what is required by a doctor to discharge his or her duty to warn. Necessarily, that will vary according to the particular circumstances presented. In this case, it is for the jury to determine whether, to satisfy the duty that Coombes recognized runs to third persons who might foreseeably be harmed by a patient who is driving while on prescribed medication, a refreshed warning was required at the time that Doe received his last methadone dose.

The court denied CSAC’s motion to strike the reports of the two experts, Drs. Randy Seewald and Charles McKay. While the precise contours of their admissible testimony will be determined by the trial judge, and doubtless some aspects of their reports will be excluded if offered as testimony, the court views the witnesses as sufficiently qualified to opine based on their training and experience about the effect that the 120 mg dose of methadone would likely have had upon Doe’s ability to safely operate a car under the circumstances that were presented.

This is so even though Doe testified that he was not affected by the methadone and that he was not drowsy at the time of the accident. The veracity of that testimony is very much contested. Also non-dispositive are the decisions of the police not to arrest Doe initially and not to cite him for impaired driving, as well as the absence of any documentation of his perceived impairment by those officers who interacted with him in the parking lot of the athletic club after he fled *258 the accident scene (whether the officers conducted any field sobriety tests is a disputed matter, as Doe testified that they did, yet no such tests were memorialized). These evidentiary points are fodder for the jury. While they might well contribute to, or result in, a verdict for CSAC, they do not compel such a result in light of the plaintiffs’ countering evidence. That evidence includes the testimony of State Police Trooper Joseph O’Keefe, who was among the officers who arrested Doe and then interviewed him at the Danvers State Police barracks in the early afternoon of that same date. He testified that Doe looked sluggish and drawn, like someone “possibly using what we call narcotic medication” (the trooper also related, however, that at that point, some five hours after the accident, Doe was not displaying some of the other typical manifestations of narcotic impairment, such as slow and raspy speech and constricted pupils).
On the record as a whole, there is a legitimate factual dispute as to whether Doe was impaired at the time of the accident.

Regarding the causation element of the plaintiffs’ negligence claim relating to the alleged negligent administration of methadone to Doe, the same analysis and result obtain as that set forth previously with respect to the plaintiffs’ duty to warn negligence claim.

There is a certain discomfiture in referring to a duty of reasonable care owed to the plaintiffs. As a medical care provider, CSAC’s duty to abide by applicable standards of care is a duty owed to their patients, and its actions must be predicated on the best medical interests of those to whom it ministers and not on the interests of others. As Justice Greaney observed in is concurring opinion in Coombes, “[a] physician should not, in ordinary circumstances, be held legally responsible for the safety of others on the highway, or elsewhere, based on medical treatment afforded a patient. To a physician, it is the patient (and not a third party with whom the physician has no direct contact) who must always come first.” 450 Mass, at 197 (Greaney, J., concurring). It is therefore perhaps more precise, or at least more correct as a practical matter, to couch the issue under consideration in terms of whether CSAC should be liable to third parties such as the plaintiffs who were foreseeably harmed as a consequence of the breach of its duty to Doe to provide reasonable care to him as its patient.

The court concedes that there is a distinction between the duty to warn and the duty of reasonable care in the sense that the latter duty, as owed to Doe and other patients, has much broader and varied purposes than the protection of the public or the patient from impaired driving as a consequence of methadone ingestion (in other words, with respect to the duty of reasonable care there is not the same degree of parallelism between the duties owed to the patient and to the public as there is with respect to the duty to warn). The court must also acknowledge that the court in Coombes (Ireland, J.) expressly stated that the duty to warn that it was recognizing therein was “narrower than a doctor’s duty to use due care when deciding to prescribe a particular drug or pursue a particular course of treatment.” 450 Mass, at 191-92. Additionally, while the court stated that it did not need to “address whether a nonpatient could base a negligence claim on a doctor’s negligent prescribing decision,” it indicated that the need to protect the doctor-patient relationship might provide a sound policy reason for declining to do so. Id., citing McKenzie v. Hawaii Permanente Medical Group, Inc., 98 Hawaii 296, 303 (2002).

The court is mindful of the current epidemic of opioid addiction and resulting overdose deaths in the Commonwealth and nationwide. It believes that methadone climes serve a vital function in combating this scourge and that the treatment they provide is beneficial not only to their patients but to the public at large. Consequently, if it believed that the extension of liability to third parties who are foreseeably harmed by a breach of a clinic’s standard of care to one of its patients would result in the shuttering of such clinics, it would strike the balance against such extension. But it does not credit such dire predictions, and, like the court in Taylor, it notes that “the physician’s duty to the third party . . . derives from the physician’s duty to the patient” and the court “impose[s] no onerous burden by insisting that a physician abide by the standards of his profession.” 892 S.2d at 896, quoting Welke v. Kuzilla, 144 Mich.App. 245, 254 (1985).

This duly to control is also, arguably, different in nature from the other two duties upon which, the court has ruled, liability may be predicated in this case, the duty to warn and the duty to use reasonable care. Those duties relate specifically to the manner in which CSAC provided its medical services to Doe. Its ability to successfully discharge those duties is uniquely within its own power. The duty to control Doe, by contrast, necessarily entails to some extent contingencies relating to his behavior that are beyond CSAC’s own control.